MARY SCATTARETICO, administratrix,[1] *vs.* JOHN PUGLISI, JR.,
& another.[2]

No. 02-P-313.

Barnstable. September 15, 2003. - December 4, 2003.

Present: ARMSTRONG, C.J., KAPLAN, & PORADA, JJ.

*Fraud. Deed,* Rescission. *Real Property,* Deed, Conveyance. *Executor and Administrator,* Recovery of assets.

The executor of an estate suing to rescind a conveyance of real property taken from the testator by fraud and to retrieve the property for the estate was barred from resort to the court under the doctrine of "unclean hands," where the executor was the "straw" for the beneficiary under the will, who perpetrated the fraud and who sought the rescission as a means of keeping the property away from his wife, who was divorcing him. [142-144]

CIVIL ACTION commenced in the Superior Court Department on February 8, 2000.

The case was tried before *Robert A. Mulligan,* J.

*Nicole M. Procida* for the plaintiff.

*Lois M. Farmer* for Una Martin Puglisi.

KAPLAN, J. Suppose an executor sues to rescind a conveyance wrested from the testator by fraud and to retrieve the property for the estate: what if it was the beneficiary under the will who committed the fraud? Such a question resounds in this appeal.

1. It will be convenient to start with background facts as developed at the jury trial. John Puglisi, Jr. (hereafter "John, Jr.") and Una Martin Puglisi were married on August 17, 1985, the second marriage for each. Two years later, on August 20, 1987, John, Jr.'s parents, John Puglisi, Sr. ("John, Sr.") and Catherine Puglisi, put their signatures to a deed which conveyed their waterfront house and lot at 11 Windmill Lane, West

---

[1] Of the estate of Catherine Puglisi.

[2] Una Martin Puglisi, his wife.

Yarmouth, Massachusetts, to John, Jr. and Una as tenants by the entirety. The deed was placed on record on July 28, 1988. John, Sr. died on December 18, 1988. Catherine died on September 28, 1996. Her will of May 20, 1988, named John, Jr. executor, and under the terms of the will he is now sole beneficiary.[3] The estate has no assets save (as will appear) a possible claim for rescission of the deed.

In December, 1998, Una left John, Jr. to live separate and apart. John, Jr. promptly commenced suit for divorce in the Surrogate's Court in New York, the State in which the couple (as well as John, Jr.'s parents) had long resided. The divorce suit is still pending.

On August 6, 1999, John, Jr. formally renounced his executorship under the will and consented that the will be admitted to probate and that Mary Scattaretico (his first cousin) be appointed administratrix. Mary was designated accordingly by the Surrogate's Court. Thereafter, on October 21, 1999, upon application, our Probate Court in Barnstable County allowed Catherine's will as a foreign will, and on February 4, 2000, the court recognized Mary as administratrix. In that role on February 8, 2000, she commenced the present action in the Barnstable Superior Court naming John, Jr. and Una as defendants.[4]

2. The "Complaint for Equitable Relief" prayed for rescission of the deed, charging the grantees, John, Jr. and Una, with "fraud, deceit and/or trickery" in procuring the signatures of the grantors, who were alleged to have "lacked knowledge that they were signing a deed."

We may overlook the preliminaries of the action and come to the trial on July 25, 2001, on this theme of rescission.

The chief witness on the part of the plaintiff administratrix was John, Jr. He testified he had defrauded his parents by concealing from them what they were signing — he said he had masked from view the material parts of the deed and presented a blank space on the page and asked them to sign, which they

---

[3]Catherine's will devised and bequeathed all her property to her husband, John, Sr., but if he did not survive her (as happened), then to their son John, Jr., if he should survive her.

[4]It will become evident that in reality John, Jr. is aligned as plaintiff. He appeared in the action but took no part in the proceedings.

obligingly did, as they would for their loving trust of him. (The parents were then in their eighties.)[5] He said he engaged in this deception because Catherine disliked Una and the parents would not be brought to execute the deed if they knew Una would be a grantee. The witness attempted to involve Una in the fraud by suggesting that she had typed the material text of the deed, but the effort was abortive.[6]

The plaintiff called Una as a witness. She denied having had any part in procuring the execution of the deed. The deed was shown to her sometime in 1989. Beginning with the summer of 1988 and continuing in summers thereafter through 1998, Una had occupied and enjoyed the Yarmouth house. Her husband paid only a few visits there. Una did not see much of either parent although they resided nearby in Westchester County, New York. Una described various occasions of meeting.

Mary Scattaretico testified that John, Jr. told her of the deed after Una left him. She attributed his resignation as executor and her nomination as administratrix to John, Jr.'s failing health at the time and the fact of her being the oldest family member. The supposed health reason, however, was shaken on cross-examination. Mary said Catherine spoke several times of disliking Una — but without vouchsafing any reason.

As the plaintiff rested, the defendant Una moved in writing for a direction upon sundry grounds including "the doctrine [of] unclean hands": denied without argument.[7]

For the defense, Una took the stand and testified largely about her efforts in caring for the Yarmouth property and her expenditures in maintaining and renovating it. The question of the respective dollar contributions of John, Jr. and Una had already been raised and ventilated during the case-in-chief, so Una's testimony at this stage was by way of rebuttal. The

---

[5]As already noted, the father died within two years of the deed. The mother went into a nursing home a year later; she was described as "vague."

[6]We suggest the proper outcome of the action would not be affected even if John, Jr. could show that Una had been involved in the scheme. It reminds of the maxim in pari delicto potior est conditio defendentis, which suggests that one in tortious league with another is generally without remedy against the other. See to this effect *Lawton* v. *Estes*, cited *infra*, 167 Mass. at 183.

[7]The other grounds asserted were statutes of limitations, laches, abuse of process, and insufficient evidence.

evidence on these matters included a welter of canceled checks and other papers and no precise picture emerged. There were contributions by both spouses, in John, Jr.'s case sometimes by reimbursing Una's outlays using money from Catherine's bank account to which he had access evidently by power of attorney.[8] Una was making the point that her care and payments argued against rescission and, at least, if rescission were allowed, would entitle her to a lien.[9]

Resting, Una renewed her motion for a directed verdict. For the purposes of the motion, it was unnecessary to go beyond the fact of the confessed fraud. But if John, Jr.'s reasoning or motivation was of interest, he could be expected to think the divorce court in its ordinary course would divide the Yarmouth property in ownership or money between Una and himself. (Its current value was $800,000.) But if he achieved rescission, the property would fall back into Catherine's estate and he would take it all as beneficiary under the will.[10] Hence the confession of the fraud. (It was not even necessary to the scheme that the confession be truthful.[11])

The judge refused the directed verdict, thus negating the "unclean hands" point.[12] He went on to formulate questions for the jury (not objected to by the parties): was the deed a valid conveyance? which if answered "yes" would render redundant the second question, did John, Jr. defraud his parents? In his charge to the jury, the judge brought out that at all events, the plaintiff, to succeed, must sustain the burden of proving fraud by a preponderance. On this basis, the jury answered "yes" to the first question.

While the jury had been out deliberating, the plaintiff's

---

[8]A suggestion emerged that John, Jr. was funneling some of his money into Una's bank account in order to avoid payment of judgments against him.

[9]Una had entered a counterclaim but it was agreed to be withdrawn without prejudice.

[10]Both parties seem to have assumed that rescission, if allowed, would have this one hundred percent result for John, Jr. We need not get into the details of the divorce court's likely distributions that might diminish John, Jr.'s putative recovery; so might possible creditors' claims.

[11]The deed itself sets out a notary's jurat dated the date of the execution of the deed but this hint of the genuineness of the deed was not followed up.

[12]Also presumably negated was the timeliness point. The judge indicated he would consider and rule on this question, but the record remains silent.

counsel renewed an argument he had made earlier, namely, that under the law of New York, which he believed applicable, and which stood, so he thought, in contrast to Massachusetts law, Una, to succeed in defending against rescission, must assume and sustain the burden of proving by clear and convincing evidence that the deed was a valid conveyance, the model being the proof needed to establish an inter vivos deed of gift. The judge considered that getting the jury's answer to a question on this line would seal the case from all angles. So the jury were held in place, the judge (over Una's objection) gave further instructions and put to them the question, whether they find on clear and convincing evidence that the deed was a valid conveyance? — the burden now to be carried by the defense. The jury returned in forty minutes with the answer "yes." Thus ended the trial, and judgment entered.

3. We reach the present appeal. The plaintiff acquiesced in the first instructions and jury questions but persuaded the judge to turn about with a jury question and instructions reversing the burden of proof and invoking New York law. As the plaintiff was denied nothing below, her position on appeal seems parlous. The plaintiff now contends that the submission under the foreign law was the correct approach, but, she adds, the situation at the end was so confused that the jury's answer to the final question was prejudiced: it may have been all too easy for the jury to cling unthinkingly to their earlier response.

The parties argue questions of what is open to review, choice of law, the substantive rule and burden of proof under the chosen law, and the conduct of the trial. We do not enter upon an analysis of these matters because Una can make the claim, raised by her directed verdict motions and entitled to preemptive consideration — that the plaintiff is barred from resort to the court because of unclean hands.[13]

The indispensable writing on the subject by Professor Cha-

---

[13]It is agreed that this issue is available to a court even if not raised by the party. See McClintock, Principles of Equity § 26, at 60 (2d ed. 1948). Here Una took the precaution of noting a cross appeal for error in denying the unclean hands claim and presumably in denying the untimeliness claim.

fee[14] advises caution in using the maxim, with attention to the practical consequences to the parties and sometimes to outsiders as well.[15] A person is not to be deprived of civil justice merely because he has sinned in the past; his wrongdoing must have been related directly to the present situation to justify his being barred.[16] There is a question whether the wrong was serious enough to count as a ground for dismissal: Chafee provides nice examples of "oversensitive" judges. The doctrine is merely meddlesome where regular substantive rules would do the job. It fades where the weight of its policy is overborne by other relevant policies.[17]

After vetting and reduction, the maxim is still left with a vital range of application, and the instant case falls readily within it. The hypothetical that can start classroom discussion is that of the man who murders one of his parents and later claims as beneficiary under the parent's will.[18] The case at bar is the more amenable to the doctrine because the fraud was purposefully and specifically directed to procuring property and is now being offered as the reason for the rescission prayed for which would

---

[14]A Cooley Lecture published in Chafee, Some Problems of Equity 1-102 (1950).

[15]Thus: Man and woman marry in a State they know to be jurisdictionally invalid for the purpose. Years later the woman sues for divorce and support. The unclean hands maxim might seem pertinent (and the pari delicto maxim as well), but the court does not condemn the woman to stew in her own juices; the court says, "it is inconsistent with good conscience and fair dealing to permit someone who holds herself or himself out as a spouse and lives as a spouse later to manipulate to that person's benefit a legal infirmity which she or he contrived." *Crease* v. *Crease*, 34 Mass. App. Ct. 187, 189 (1993). See Chafee, *supra* at 73-75.

[16]Chief Baron Eyre who, according to Chafee, *supra* at 8, first uttered the maxim, "A man must come into a Court of Equity with clean hands," was well aware of the point: "it does not mean a general depravity; it must have an immediate and necessary relation to the equity sued for." *Dering* v. *Earl of Winchelsea*, 1 Cox Eq. 318, 319, 29 Eng. Rep. 1184, 1185 (Ex. 1787).

[17]In 1950, Chafee, *supra* at 34-35, was still interested to show that unclean hands applied "at law" as well as "in equity," and he noted, further, that it could have analogical application in the criminal law, citing *Olmstead* v. *United States*, 277 U.S. 438 (1928). The Brandeis dissent, considering the admissibility of evidence procured illegally, invoked the civil concept of unclean hands. *Id.* at 483-485.

[18]Hart & Sacks, The Legal Process 68-102 (Eskridge & Frickey eds., 1994), rings changes on the "The Case of the Spoiled Heir" and deals with statutory treatment of the murder model.

increase the boodle. There are plenty of examples of suits to rescind transactions which are aborted and dismissed when it turns out the plaintiff participated in the wrong that is the ground for the rescission. For prototypical Massachusetts instances, see *Lawton* v. *Estes*, 167 Mass. 181 (1896) (one heir improperly purchases property at tax sale; plaintiff heir, otherwise entitled upon rescission of the sale to a fractional undivided share with others, is dismissed for having connived at the sale); *Lyons* v. *Elston*, 211 Mass. 478 (1912) (defendant secured deed from mother through undue influence; in suit by two relatives to rescind the deed and regain the property, one is dismissed because she participated in the wrong). Finally, the plaintiff administratrix herein cannot separate herself from the wrongdoer John, Jr.: he made her his straw or front or stand-in, as he confirms when he says he thought it would be unseemly for him (qua executor) to sue himself.

The judgment for the defendants appealed from is reversed, and judgment will enter dismissing the action.[19]

*So ordered.*

---

[19]See note 17, *supra.* Justice Brandeis says, "The rule is one, not of action, but of inaction." *Olmstead* v. *United States*, 277 U.S. at 484.