NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12434

MERRIMACK COLLEGE  vs.  KPMG LLP.


Suffolk.     May 8, 2018. - September 27, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, & Cypher, JJ.


Agency, Agent's knowledge.  Practice, Civil, Answer, Amendment,
     Affirmative defense.



Civil action commenced in the Superior Court Department on
June 30, 2014.

A motion for leave to file an amended answer was heard by
Kenneth W. Salinger, J., and the case was heard by him on a
motion for summary judgment.

The Supreme Judicial Court granted an application for
direct appellate review.


Elizabeth N. Mulvey for the plaintiff.
Ian D. Roffman (George A. Salter also present) for the
defendant.
The following submitted briefs for amici curiae:
Matthew P. Bosher, of the District of Columbia, & Elbert
Lin for American Institute of Certified Public Accountants &
another.
Susan M. Whalen for Chelsea Housing Authority.
Jeffrey J. Nolan for Massachusetts Academy of Trial
Attorneys.

GANTS, C.J.  "The doctrine of in pari delicto bars a plaintiff who has participated in wrongdoing from recovering damages for loss resulting from the wrongdoing."  Choquette v. Isacoff, 65 Mass. App. Ct. 1, 3 (2005).  The main issue presented in this civil case is whether, where the plaintiff is an organization acting through its agents, we should follow the traditional principles of agency law and impute the wrongdoing of those agents to the plaintiff organization when determining whether it should be barred from recovery under the in pari delicto doctrine.  We hold that, for purposes of measuring fault under the in pari delicto doctrine, we impute only the conduct of senior management to the plaintiff organization.  Because the judge here granted summary judgment to the defendant under the in pari delicto doctrine after imputing to the plaintiff college the wrongdoing of an employee who was not a member of senior management, we vacate the order allowing summary judgment and remand the case to the Superior Court.[1]

Background.  Merrimack College (Merrimack) is a small private college incorporated under the laws of Massachusetts. From 1998 to 2004, Merrimack engaged KPMG LLP (KPMG), a large multinational accounting firm, as its independent auditor.

---

[1] We acknowledge the amicus briefs submitted by the American Institute of Certified Public Accountants and the Massachusetts Society of Certified Public Accountants, by the Chelsea Housing Authority, and by the Massachusetts Academy of Trial Attorneys.

Pursuant to this engagement, KPMG conducted annual audits of Merrimack's financial statements.  Because Merrimack received substantial Federal funds in the form of student financial aid, KPMG also conducted audits pursuant to the United States Office of Management and Budget Circular A-133 (A-133 audits) to evaluate Merrimack's compliance with relevant Federal requirements.

In conducting these audits, KPMG reviewed the operations of Merrimack's financial aid office, which was responsible for administering various grant and loan programs, including Federal programs such as the Perkins Loan Program.[2]  On several occasions KPMG noted issues with the financial aid office, including delayed reconciliations, discrepancies between loan amounts recorded in the billing system and loan amounts recorded on the ledger, and Perkins loans disbursed without the required promissory notes.  KPMG also noted a lack of formal policies and procedures relating to the disbursement of grants and loans.  KPMG reported these issues to Merrimack's management and to its

---

[2] The Perkins Loan Program is "designed to assist institutions of higher education in financing low-interest loans to financially needy students."  De La Mota v. United States Dep't of Educ., 412 F.3d 71, 74 (2d Cir. 2005).  See 20 U.S.C. § 1070 (2012).  Under this program, the United States Department of Education provides Federal funds to participating schools, who in turn make additional capital contributions and disburse the combined funds as loans to eligible students.  The individual schools are responsible for determining eligibility, advancing funds, and collecting payments.  See De La Mota, supra.

board of trustees.  However, for every fiscal year between 1998 and 2004, KPMG issued an unqualified opinion that Merrimack's financial statements were free from material misrepresentation and also issued an opinion, based on its A-133 audits, that Merrimack was in material compliance with Federal program requirements.

What KPMG's audits failed to reveal was that, during this time period, Merrimack's financial aid director, Christine Mordach, was engaged in a fraudulent scheme whereby she regularly replaced grants and scholarships that had previously been awarded to students with Perkins loans, often without the students' knowledge or consent and in some cases creating false paperwork with false names and false Social Security numbers. One consequence of Mordach's fraud was that it made the financial aid office's budget appear more balanced, because grants and scholarships reduce tuition revenue, whereas Perkins loans, because they are expected to be repaid in the future, are recorded as an asset on Merrimack's balance sheet.  Another consequence of her fraud was that many students ended up shouldering student debt they had not sought and did not even know they had.  Mordach did not tell anyone else at Merrimack that she was issuing fraudulent loans.

Mordach's fraud went undetected until 2011, when Merrimack instituted a new system for keeping track of its student

borrowers and many students started to receive billing statements for Perkins loans they never knew they had. As the number of complaints increased, Merrimack hired a forensic accounting team, unrelated to KPMG, to investigate the financial aid office. This investigation revealed more than 1,200 "irregular" student loans that were either invalid or potentially uncollectible because of Mordach's activities.

In 2014, Mordach pleaded guilty to Federal criminal charges of mail and wire fraud. She was sentenced to a term in prison and ordered to pay over $1.5 million in restitution to former Merrimack students. However, her motivation for committing this fraud remains unclear. No one at Merrimack ever told Mordach to issue loans to students without the students' consent. Mordach did not profit financially from her fraud; in fact, in order to avoid detection she sometimes used her own funds to pay back the fraudulent loans. There was evidence that, at least in the short run, until the fraud was detected, the fraud benefited Merrimack in that it enabled Merrimack to present a more favorable view of its financial position in connection with bond issues and bond ratings. But there was also evidence that Mordach devised the fraudulent scheme in order to keep her job, because she was under pressure to balance the financial aid office's budget, had nearly been fired in 1990 for her poor

performance, and continued to have performance issues that caused Merrimack to place her on probation in 2003.

Once Mordach's activities were discovered, Merrimack wrote off the fraudulent loans and repaid students who had already made payments on them.  According to Merrimack, the total cost of these write-offs and repayments, along with investigation and administrative fees, amounted to more than $6 million.

In an effort to recover some of these losses, Merrimack commenced an action against KPMG in the Superior Court, alleging professional malpractice, breach of contract, negligence, negligent misrepresentation, and violation of G. L. c. 93A. Following discovery, KPMG moved for summary judgment on four separate grounds, arguing that Merrimack's claims were barred under the equitable doctrine of in pari delicto, that Merrimack had released KPMG from liability under the terms of their agreements because its management had made false statements to KPMG,[3] that Merrimack's claims were barred by the Massachusetts

_____

[3] Pursuant to the terms of its agreements with KPMG LLP (KPMG), Merrimack College (Merrimack) provided annual management representation letters to KPMG.  In these letters, the president, the chief financial officer, and the controller of Merrimack represented "to the best of [their] knowledge and belief" that, among other things, there were no instances of fraud involving management or employees with "significant roles in internal control," no instances of fraud involving others that could have "a material effect on the financial statements," and "no . . . [v]iolations or possible violations of laws or regulations."  Merrimack also provided representation letters in connection with KPMG's audits conducted pursuant to the United

statute of limitations for auditor malpractice claims, and that

Merrimack had failed to establish a claim under c. 93A.  KPMG

also filed a motion for leave to file an amended answer, seeking

to add the affirmative defense of release based on false

statements from management.

The Superior Court judge allowed KPMG's motion for summary

judgment, concluding that Merrimack's claims were barred under

the doctrine of in pari delicto.  The judge's analysis proceeded

in three steps.  First, the judge considered whether Mordach's

fraudulent conduct should be imputed to Merrimack.  In doing so,

the judge relied on traditional principles of agency law,

concluding that "[the] same 'agency-based imputation rules' for

deciding whether an employer will be held vicariously liable for

its employee's wrongdoing" under a theory of respondeat superior

"appl[ied] with full force in this case, because they also

determine whether an employee's misconduct is imputed to the

_____

States Office of Management and Budget Circular A-133, in which
members of Merrimack's management -- including in some years
Christine Mordach -- represented, again "to the best of [their]
knowledge and belief," that Merrimack had "complied . . . with
the requirements of laws and regulations."  Separately, the
engagement letters setting forth the terms of KPMG's engagement
provided that "[Merrimack] agrees to release KPMG . . . and its
personnel from any claims . . . relating to [KPMG's] services
. . . attributable to any misrepresentations in the
representation letter [from management]."  With respect to the
management representation letters not signed by Mordach, the
parties dispute whether there was any "misrepresentation," given
that the representations were only based on "knowledge and
belief."  The parties also dispute whether the representation
letters signed by Mordach fall within the scope of the release.

employer when applying the in pari delicto doctrine" (citation omitted).  The judge then applied the familiar three-pronged test for determining vicarious liability under a theory of respondeat superior, concluding that, because Mordach's conduct was "of the kind [she was] employed to perform," "occur[red] substantially within the authorized time and space limits," and "[was] motivated, at least in part, by a purpose to serve the employer," it was "within the scope of [her] employment" and should be imputed to Merrimack.  Wang Lab., Inc. v. Business Incentives, Inc., 398 Mass. 854, 859 (1986).

Second, the judge weighed the seriousness of the imputed misconduct against KPMG's failure to detect it.  Because Merrimack had admitted to facts indicating that Mordach's conduct was deliberate, the judge concluded that Mordach's intentional fraud -- now imputed to Merrimack -- was "far more serious" than KPMG's alleged negligence in failing to uncover Mordach's fraud, and that Merrimack therefore could not recover from KPMG under the doctrine of in pari delicto.

Third, the judge considered whether he should, on public policy grounds, make an exception to the in pari delicto doctrine for cases like this one, where an auditor through alleged negligence failed to discover fraud committed by a client's employee.  The judge recognized that, because "[the in pari delicto] doctrine is equitable in nature, considerations of

public policy are always relevant." But the judge declined to make an exception, reasoning that such an exception would be inconsistent with Massachusetts law, which, in the analogous context of legal malpractice claims, bars clients who engaged in wrongdoing from suing their attorneys for joining in the wrongdoing. See Choquette, 65 Mass. App. Ct. at 7-8. The judge also noted that the majority of courts that have considered the issue have "declined to create a blanket 'auditor exception' to the doctrine of in pari delicto." See, e.g., Stewart v. Wilmington Trust SP Servs., Inc., 112 A.3d 271, 315-318 (Del. Ch.), aff'd, 126 A.3d 1115 (Del. 2015); Kirschner v. KPMG LLP, 15 N.Y.3d 446, 476-477 (2010); Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP, 605 Pa. 269, 305 (2010).

Having concluded that Merrimack's claims were barred under the in pari delicto doctrine, the judge dismissed the claims with prejudice, without addressing KPMG's other grounds for summary judgment. The judge also allowed KPMG's motion for leave to amend its answer to add an affirmative defense of release. Merrimack appealed from these decisions, and we granted its application for direct appellate review.

Discussion. 1. Motion for summary judgment. We review a grant of summary judgment de novo. See Federal Nat'l Mtge. Ass'n v. Hendricks, 463 Mass. 635, 637 (2012). In granting

summary judgment to KPMG, the judge relied on two separate legal doctrines: the agency-based doctrine of imputation, and the equitable doctrine of in pari delicto. To determine whether Merrimack's claims are indeed barred as a matter of law, we must first examine these two legal doctrines and the relationship between them.

a. _Imputation_. The law of agency establishes a set of rules for determining when, in relation to third parties, an agent's conduct or knowledge should be imputed to his or her principal. See Restatement (Third) of Agency §§ 2.01-2.04, 5.03 (2006). For example, in transactions with third parties, an agent's conduct will be imputed to the principal if the agent acted with actual or apparent authority, or if the principal ratified the agent's conduct. See Fergus v. Ross, 477 Mass. 563, 566-568 (2017). See also Restatement (Third) of Agency, supra at §§ 2.01-2.03, 4.02. In the realm of torts, the tortious conduct committed by an agent in the scope of his or her agency will be imputed to the principal under a theory of respondeat superior. See Lev v. Beverly Enters.-Mass., Inc., 457 Mass. 234, 238 (2010). See also Restatement (Third) of Agency, supra at § 2.04. Knowledge that an agent acquires in the scope of his or her employment can also be imputed to the principal. See Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 425 Mass. 63, 66-67

(1997).  See also Restatement (Third) of Agency, supra at § 5.03.

The result of imputation is that the principal bears the legal consequences of the agent's conduct.  Thus, if an agent with actual or apparent authority enters into a contract with a third party, the principal will be bound by that contract.  See, e.g., Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 4, 17, cert. denied, 522 U.S. 1015 (1997) (university bound by agreement signed by vice-president where vice-president had apparent authority).  And if an agent negligently injures a third party while acting within the scope of the agency, the principal will be held vicariously liable for that negligence. See, e.g., Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 323 (2002) (corporation could be held vicariously liable for alleged medical malpractice of its physician-employee).

Imputation serves various functions.  It creates incentives for principals to choose their agents wisely.  See Restatement (Third) of Agency, supra at § 5.03 comment b, at 360.  It also encourages principals to supervise their agents and to share information with them.  Id.  The ultimate purpose behind these rules of imputation, however, is to fairly allocate risks between principals and innocent third parties.  As we explained in Kansallis Fin. Ltd. v. Fern, 421 Mass. 659, 664-665 (1996) (Kansallis):

> "Standing behind [the] diverse concepts of vicarious liability is a principle that helps to rationalize them. This is the principle that as between two innocent parties -- the principal-master and the third party -- the principal-master who for his own purposes places another in a position to do harm to a third party should bear the loss.  A principal who requires an agent to transact his business, and can only get that business done if third parties deal with the agent as if with the principal, cannot complain if the innocent third party suffers loss by reason of the agent's act.  Similarly, the master who must put an instrument into his servant's hands in order to get his business done . . . must also bear the loss if the servant causes harm to a stranger in the use of that instrument as the business is transacted."  (Citations omitted.)

See also Dias, 438 Mass. at 320 ("The doctrine of respondeat superior in the Commonwealth . . . evolved to place the burden of liability on the party better able to bear that burden"); GTE Prods. Corp. v. Broadway Elec. Supply Co., 42 Mass. App. Ct. 293, 300 (1997) ("The rationale for imputing an agent's knowledge to his principal . . . [is] to do justice to an innocent third party . . ."); Restatement (Third) of Agency, supra at § 5.04 comment b, at 392 ("imputation protects innocent third parties").

Because the rules of imputation are designed to protect innocent third parties, they are typically applied in situations where a third party sues a principal, for example to enforce a contract entered into by an agent or to recover for injuries caused by the agent's tortious conduct.  Imputation can also provide a defense to a third party, for example where a

principal seeks to enforce a contract that a third party executed because of the fraudulent inducement of the agent. See, e.g., Jewett v. Carter, 132 Mass. 335, 337 (1882) (principal cannot enforce contract that third party entered into based on agent's false representations). See also Restatement (Third) of Agency, supra at § 6.11 & comment c.

Importantly, the purpose of imputation is not to adjudicate fault. As we have consistently recognized, imputing the wrongful actions of an agent to a principal does not mean that the principal itself has acted wrongfully. See Elias v. Unisys Corp., 410 Mass. 479, 481 (1991) ("[T]he principles of vicarious liability apply where . . . [t]he principal is without fault. The liability of the principal arises simply by the operation of law and is only derivative of the wrongful act of the agent" [emphasis added]). See also Karcher v. Burbank, 303 Mass. 303, 305 (1939) ("if the [principal] is chargeable with the negligence of the [agent], it is only because his negligence is imputed to it by a rule of law"). The rules of imputation are legal rules, not equitable principles, that are designed to allocate risk, not blame.

b. In pari delicto. In contrast, the doctrine of in pari delicto is an equitable one, focused squarely on the moral blame

of the parties.  Latin for "in equal fault,"[4] the doctrine

provides that a plaintiff who has participated in wrongdoing

cannot recover damages resulting from the wrongdoing.  See

Black's Law Dictionary 911 (10th ed. 2014).  See also Choquette,

65 Mass. App. Ct. at 3.  This long-standing doctrine "is

grounded on two premises:  first, that courts should not lend

their good offices to mediating disputes among wrongdoers; and

second, that denying judicial relief to an admitted wrongdoer is

an effective means of deterring illegality" (footnotes omitted).

Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299,

306 (1985) (Bateman).

In Massachusetts, the doctrine has generally operated to

bar recovery where the parties have engaged in joint wrongdoing.

Where a plaintiff engages in intentional wrongdoing and seeks to

recover from a defendant who was a coconspirator or accomplice

in the plaintiff's wrongdoing, the doctrine will generally bar

recovery.  See Baena v. KPMG LLP, 453 F.3d 1, 6 (1st Cir. 2006);

Scattaretico v. Puglisi, 60 Mass. App. Ct. 138, 140 n.6 (2003)

("one in tortious league with another is generally without

remedy against the other").  See also, e.g., Duane v. Merchants

Legal Stamp Co., 231 Mass. 113, 118, 119 (1918), cert. denied,

---

[4] The full maxim is "in pari delicto potior est conditio defendentis," meaning "[i]n a case of equal or mutual fault . . . the position of the [defending party] . . . is the better one" (citation omitted).  Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985).

249 U.S. 613 (1919) (minority shareholder who participated in corporation's anticompetitive scheme barred from recovering profits from that scheme); Choquette, 65 Mass. App. Ct. at 7-8 (plaintiff who committed perjury barred from recovering from attorney who participated in perjury). Similarly, where the parties have entered into an illegal contract, courts will generally decline to enforce the contract. See Berman v. Coakley, 243 Mass. 348, 350 (1923) ("courts will not aid in the enforcement, nor afford relief against the evil consequences, of an illegal or immoral contract"). See also, e.g., Arcidi v. National Ass'n of Gov't Employees, Inc., 447 Mass. 616, 619-622 (2006) (plaintiff barred from recovering payment made under contract where contract violated statute); Patterson v. Clark, 126 Mass. 531, 532-533 (1879) (plaintiff barred from recovering payment made under illegal gambling contract); Atwood v. Fisk, 101 Mass. 363, 363-364 (1869) (plaintiff barred from seeking cancellation of notes executed in exchange for illegal promise to suppress prosecution).

Because the doctrine is equitable in nature, however, it is not to be applied mechanically. "One well established exception to the doctrine of in pari delicto provides that 'where the parties are not in equal fault as to the illegal element . . . and where there are elements of public policy more outraged by the conduct of one than of the other, then relief in equity may

be granted to the less guilty.'" Choquette, 65 Mass. App. Ct. at 4, quoting Council v. Cohen, 303 Mass. 348, 354 (1939). See, e.g., Berman, 243 Mass. at 355 (plaintiff who was fraudulently induced to enter into illegal contract by attorney could recover from attorney, where attorney's conduct was "far more reprehensible" than plaintiff's). See generally 1 J. Story, Commentaries on Equity Jurisprudence § 423, at 399-400 (14th ed. 1918) ("One party may act under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age; so that his guilt may be far less in degree than that of his associate in the offence" [footnote omitted]).

"Another exception involves 'cases where the public interest requires that [the courts] should, for the promotion of public policy, interpose, and the relief in such cases is given to the public through the party.'" Choquette, 65 Mass. App. Ct. at 4, quoting Council, 303 Mass. at 354-355. See, e.g., Broussard v. Melong, 322 Mass. 560, 562 (1948) (worker who contracted to work longer hours than permitted by statute could recover overtime wages from employer where statute was enacted to protect workers); Council, supra (homeowner who granted mortgage in violation of statute could recover interest paid to mortgagee where statute was enacted to protect homeowners). See generally Story, supra at 400 ("there may be on the part of the court itself a necessity of supporting the public interests or

public policy in many cases, however reprehensible the acts of the parties may be").

Thus, in Bateman, 472 U.S. at 301-305, the United States Supreme Court concluded that the in pari delicto doctrine did not bar investors who purchased securities based on inside information (tippees) from bringing an action under Federal securities laws against the insiders who provided them with the information to recover their subsequent trading losses when the inside information turned out to be false. The Court concluded that a private action for damages may be barred under the in pari delicto doctrine "on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." Id. at 310-311.

As to the first element, the Court determined that a tippee who trades on inside information is not as blameworthy as a corporate insider or broker-dealer who discloses the inside information for personal gain. See id. at 312-314. As to the second, the Court determined that "denying the in pari delicto defense in such circumstances will best promote the primary objective of the federal securities laws -- protection of the

investing public and the national economy through the promotion of 'a high standard of business ethics . . . in every facet of the securities industry.'" Id. at 315, quoting Securities & Exch. Comm'n v. Capital Gains Research Bur., Inc., 375 U.S. 180, 186-187 (1963). The Court reasoned that barring private actions in these types of cases because of the in pari delicto doctrine "would inexorably result in a number of alleged fraudulent practices going undetected by the authorities and unremedied," Bateman, supra, and that allowing tippees to bring such cases against corporate insiders and broker-dealers would maximize the deterrence of insider trading. See id. at 316.

We note that the doctrine of in pari delicto is separate and distinct from comparative negligence, codified in G. L. c. 231, § 85. Under the comparative negligence statute, a plaintiff is barred from recovery only where the plaintiff's negligence is greater than the defendant's, meaning that it accounts for more than fifty per cent of the parties' combined negligence. Where the plaintiff's negligence is less than the defendant's, the plaintiff is still allowed to recover, although any damages awarded will be "diminished in proportion to the amount of negligence attributable" to the plaintiff. Id. Thus, under the comparative negligence statute, the plaintiff's relative fault is considered only when apportioning damages and does not necessarily preclude recovery. But the comparative

negligence statute does not apply where the plaintiff has engaged in intentional wrongdoing; it applies only where the plaintiff and defendant are both found to be negligent. See Boyd v. National R.R. Passenger Corp., 446 Mass. 540, 548 n.11 (2006) ("The comparative negligence statute is not applicable to intentional or wilful, wanton, or reckless conduct"). Where the plaintiff has engaged in intentional wrongdoing, the in pari delicto doctrine, if applicable, serves as a complete bar to recovery.

Where the parties are individuals, application of the in pari delicto doctrine is relatively straightforward: the moral culpability of one party is measured against the moral culpability of the other. Thus, a plaintiff who engages in intentional wrongdoing is unlikely to recover from a defendant who is alleged to be merely negligent, unless public policy dictates otherwise. See Kirschner, 15 N.Y.3d at 464 ("A criminal who is injured committing a crime cannot sue the police officer or security guard who failed to stop him; the arsonist who is singed cannot sue the fire department").

But where the parties are organizations that can act only through their agents, as here, the task becomes more complicated. The question then arises: how do we determine the moral culpability of each party? If we apply the traditional rules of imputation that determine legal responsibility with

respect to third parties and impute Mordach's intentional misconduct to Merrimack, the in pari delicto doctrine may bar recovery. But if we do not impute Mordach's intentional misconduct to Merrimack, then the worst that can be alleged here based on the evidence is that Merrimack was negligent in its retention or supervision of Mordach, in which case Merrimack's recovery will be governed by the principles of comparative negligence, not in pari delicto.

The judge cited two cases in support of his decision to apply traditional principles of agency law and impute Mordach's fraudulent conduct to Merrimack. One was a decision from the New York Court of Appeals, Kirschner, 15 N.Y.3d at 446, applying New York law. See id. at 465 ("Traditional agency principles play an important role in an in pari delicto analysis"). The other was a decision from the United States Court of Appeals for the First Circuit, Baena, 453 F.3d at 1, applying Massachusetts law.

In Baena, the First Circuit held that the in pari delicto doctrine barred a trustee, acting on behalf of a bankrupt corporation, from recovering from the corporation's former accountants for their failure to prevent the fraudulent conduct of the corporation's senior managers. Id. at 6. In imputing the senior managers' conduct to the corporation, the First Circuit explicitly recognized the possibility that

"Massachusetts might take a narrow view of imputation in the context of in pari delicto." Id. at 7. It also noted that "[w]hether or not application of the in pari delicto doctrine should depend on imputation rules borrowed from agency law is debatable." Id. at 8. Nevertheless, absent clear guidance from Massachusetts appellate courts, the First Circuit limited itself to the "traditional standards" governing imputation, id. at 7, writing: "It is not our job to make new law for Massachusetts . . . ." Id. at 8.[5]

And indeed, that job is ours. See O'Melveny & Myers v. Federal Deposit Ins. Corp., 512 U.S. 79, 83-85 (1994) (rules governing imputation are matter of State law). We recognize that, in at least one case, we have barred a plaintiff from recovery under the in pari delicto doctrine because of the

---

[5] The First Circuit concluded that "ordinary agency-based imputation rules appear to operate in Massachusetts, . . . whether the issue is primary liability of the company or in pari delicto." Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006). However, the only case cited in support of this proposition of Massachusetts law was Rea v. Checker Taxi Co., 272 Mass. 510 (1930), and this case is simply inapposite. In Rea, we held only that the doctrine of in pari delicto did not bar a taxicab passenger who was injured by the driver's negligence from recovering from the driver's employer, because she was not at fault. Id. at 514. The only conduct that was imputed in that case was the conduct of the defendant's agent, the driver, to the defendant, the driver's employer -- as is typical under a theory of respondeat superior. Id. at 512. The plaintiff herself was an individual acting on her own behalf, not a principal acting through an agent. Thus, this case has no bearing on whether, where a plaintiff is acting through an agent, that agent's conduct should be imputed to the plaintiff for purposes of the in pari delicto doctrine.

misdeeds of the plaintiff's agent. In Arcidi, 447 Mass. at 619-622, we held that a union that had entered into an illegal contract could not recover the payments it had made under that contract. In doing so, we rejected the union's argument that the union itself was not at fault because it was the decision of the union president, acting on behalf of the union, to enter into the illegal contract. Id. at 618, 622. We reasoned that, "because an organization can only act through agents," separating the conduct of an organization from its agents in this context "would make it too easy for organizations to reap the benefits of illegal contracts when it is convenient, while deflecting the consequences onto agents and third parties when it is not." Id. at 622. Thus, in Arcidi we effectively imputed the union president's conduct to the union to bar recovery under the in pari delicto doctrine. We did not, however, consider whether the doctrine is always governed by traditional rules of imputation under Massachusetts common law, and we are not aware of any decision from this court or the Appeals Court -- nor has one been cited to us -- that squarely confronts the issue. In deciding this issue, we therefore write on what is essentially a clean slate of Massachusetts law.

We note first that the traditional rules of imputation, although broad in application, are not without their limits. As stated, the rules of imputation are premised on the risk-

allocation principle that, as between an innocent principal and an innocent third party, it is the principal -- who is responsible for selecting and supervising the agent -- who should bear the loss resulting from an agent's actions. See Kansallis, 421 Mass. at 664. "This overarching principle" not only unifies the various rules of imputation but also "suggests [their] . . . limitations." Id. at 665. Here, for instance, if a student who had been issued a fraudulent loan sought to recover damages from Merrimack, there would be little doubt that Mordach's fraud should be imputed to Merrimack under a theory of respondeat superior and that Merrimack should be held vicariously liable to the student. This is because the student is an innocent third party and, as between Merrimack and the student, it is Merrimack that should pay for the damage. But if Merrimack were to then sue Mordach for indemnification, as it would be entitled to do, see Elias, 410 Mass. at 482, Mordach may not offer as a defense to the indemnification claim that her fraud should be imputed to Merrimack, making it equally culpable, because the rationale for imputation -- the need to protect innocent third parties -- is absent. See Restatement (Third) of Agency, supra at § 5.03 comment b ("imputation does not furnish a basis on which an agent may defend against a claim by the principal"). Cf. American Int'l Group, Inc. v. Greenberg, 965 A.2d 763, 828 n.246 (Del. Ch. 2009), aff'd, 11

A.3d 228 (Del. 2011) ("[Although] the behavior of faithless fiduciaries is imputed to the corporation when the corporation faces liability to innocent third-parties . . . [,] [t]his, of course, has never prevented the corporation [itself] from recovering against those faithless fiduciaries in a derivative suit").

The traditional rules of imputation are similarly inapplicable where the aim is to assign blame rather than risk. Thus, where an employee has engaged in misconduct, and where a person harmed by that misconduct seeks punitive damages against the employer, that misconduct will not necessarily be imputed to the employer. See Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 298-299 (2016). Rather, in awarding punitive damages, "it is the actions of the employer, not the actions of that employee, that are the appropriate focus, and . . . it is the employer's conduct that must be found to be outrageous or egregious." Id. at 299 n.14. And, in determining whether the employer engaged in outrageous or egregious conduct, we look to whether "members of senior management" participated in the misconduct, or acquiesced in it by knowing of the misconduct and failing to remedy it. See id. at 300-301. The misconduct of lower-level employees -- even those at the supervisory level -- is insufficient to warrant punitive damages. See id. at 298. In this context, we depart from the usual rules of imputation

because an award of punitive damages requires a moral judgment that the defendant's conduct is so blameworthy that it "justifies punishment [rather than] merely compensation." Haddad v. Wal-Mart Stores, Inc. (No. 1), 455 Mass. 91, 110 (2009). See Pinshaw v. Metropolitan Dist. Comm'n, 402 Mass. 687, 697 (1988), quoting Smith v. Wade, 461 U.S. 30, 52 (1983) ("The award of punitive damages is 'a discretionary moral judgment' . . ."). Accordingly, conduct by an employee that is sufficient to hold an employer vicariously liable for compensatory damages does not necessarily suffice to justify punitive damages against the employer. To support an award of punitive damages, a jury must find the employer itself to be morally blameworthy, and that requires a finding that a member of the employer's senior management was morally blameworthy.

For similar reasons, we conclude that, under our common law, a principal acting through an agent may not be barred from recovery under the doctrine of in pari delicto unless the principal itself is found to be morally blameworthy, and conduct by an agent that is sufficient to hold a principal vicariously liable to third parties will not always be sufficient, on its own, to support that finding. Where the plaintiff is an organization that can only act through its employees, its moral responsibility is measured by the conduct of those who lead the organization. Thus, where the plaintiff is a corporation, as

here, we look to the conduct of senior management -- that is, the officers primarily responsible for managing the corporation, the directors, and the controlling shareholders, if any. Only their intentional misconduct may be imputed to the plaintiff under the doctrine of in pari delicto and, only then, will a court need to consider whether application of the doctrine would comport with public policy.[6]

Here, viewing the evidence in the light most favorable to Merrimack, we conclude that Mordach cannot be deemed a member of senior management whose conduct may be imputed to Merrimack. Although we recognize that Mordach had substantial responsibilities as financial aid director, she was not an officer of Merrimack and, in contrast with its president and chief financial officer, she was not among the select few who were primarily responsible for the management of the college. As a result, Merrimack cannot be deemed because of Mordach's

---

[6] We note that this rule is consistent with the few cases where courts, applying Massachusetts law, have imputed an agent's conduct to a plaintiff to bar recovery under the in pari delicto doctrine. In Arcidi v. National Ass'n of Gov't Employees, Inc., 447 Mass. 616, 622 (2006), we barred a union from recovering under an illegal contract based on the actions of the union's president. Meanwhile, in Baena, 453 F.3d at 3 & n.1, 6-7, the First Circuit held that the in pari delicto doctrine barred a claim against a corporation's auditors for failing to prevent fraud, where the corporation's "top officers and directors" -- the chairman of the board, the chief executive officer, the chief financial officer, and the managing director -- were alleged to have orchestrated the fraud. In both cases, it was the conduct of senior management that was imputed for purposes of the in pari delicto doctrine.

misconduct to have engaged in intentional wrongdoing that would bar it from recovering damages against KPMG under the in pari delicto doctrine.  Instead, we must look to the conduct of Merrimack's senior management, and the evidence, again viewed in the light most favorable to Merrimack, supports at most a finding that senior management was negligent in retaining Mordach as financial aid director or in failing adequately to supervise her.  This conduct may limit Merrimack's recovery under the comparative negligence statute, but does not rise to the level that would bar recovery entirely under the doctrine of in pari delicto.

Because the judge granted summary judgment to KPMG on the sole ground that Merrimack's claims were barred under the doctrine of in pari delicto, we vacate the order granting summary judgment and remand the case to the Superior Court for consideration of KPMG's three other grounds for summary judgment.  We decline to address these grounds where the judge did not address them, and where the parties did not brief them on appeal.  On remand, the judge will therefore have to consider whether summary judgment is warranted on alternative grounds.

Having so found, we need not consider whether, as a matter of public policy, we would carve out an exception to the in pari delicto doctrine in cases where an organization seeks to recover damages from its auditor for the auditor's negligence in failing

to detect fraud committed by members of senior management.[7]  We decline to consider whether to adopt such an exception under our common law, not only because it is unnecessary to our decision, but also because the Legislature in 2001 enacted G. L. c. 112, § 87A ¾, which applies to "conduct occurring after its effective date [February 23, 2003]."  St. 2001, § 147, § 2.  Section 87A ¾ provides that, where a "firm licensed to practice public accountancy . . . is held liable for damages in a civil action arising from or related to its provision of services," and where

---

[7] In NCP Litig. Trust v. KPMG LLP, 187 N.J. 353, 357 (2006) (NCP), the Supreme Court of New Jersey held that imputation does not bar corporate shareholders from suing an auditor where the auditor negligently failed to uncover fraud committed by corporate officers and directors.  In reaching this conclusion, the court emphasized that "third-party auditors are specifically retained for the task of monitoring corporate activity," id. at 379, and that allowing an auditor to escape liability where it fails to do so would "stretch [the imputation doctrine] to its breaking point," id. at 372.  The Superior Court judge in this case characterized the decision in NCP as creating an "auditor exception" to the doctrine of in pari delicto, when in fact the court in NCP did not address the in pari delicto doctrine, and instead focused only on the related doctrine of estoppel.  The court's holding is better understood as creating an exception to the traditional rules of imputation for cases involving auditor negligence.  See id. at 372 n.2 (auditor negligence is considered both "an exception to the imputation doctrine and a ground for estoppel").  See also Kirschner v. KPMG LLP, 15 N.Y.3d 446, 471 (2010) (New Jersey has "fashioned [a] carve-out[] from traditional agency law in cases of corporate fraud so as to deny the in pari delicto defense to negligent or otherwise culpable auditors"); Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers LLP, 605 Pa. 269, 305 (2010) ("we read the rationale for the New Jersey Supreme Court's decision in NCP as effectively negating imputation [and thus barring the in pari delicto defense] relative to . . . claims of negligence against auditors").

the "plaintiff or other party, individual, or entity has been found to have acted fraudulently in the pending action or in another action or proceeding involving similar parties, individuals, entities and claims" and "the fraud was related to the performance of the duties of the . . . firm," "the trier of fact shall determine:  (a) the total amount of the plaintiff's damages, (b) the percentage of fault attributable to the fraudulent conduct of the plaintiff or other party, individual or entity contributing to the plaintiff's damages, and (c) the percentage of fault of the . . . firm . . . in contributing to the plaintiff's damages."[8]  Under this statute, if a plaintiff suffered damages of $1 million, and seventy per cent of those damages is attributable to the plaintiff's own fraudulent conduct while only thirty per cent is attributable to the negligence of the defendant accounting firm, the defendant shall not be required to pay more than $300,000.[9]

---

[8] General Laws c. 112, § 87A ¾, does not apply "where a finding is made that the acts of the individual or firm in the practice of public accountancy were willful and knowing."

[9] The full text of G. L. c. 112, § 87A ¾, is reprinted below:

> "When an individual or firm licensed to practice public accountancy under [§] 87B or 87B ½ is held liable for damages in a civil action arising from or related to its provision of services involving the practice of public accountancy, in which action a claim or defense of fraud is raised against the plaintiff or another party, individual or entity, and that plaintiff or other party, individual,

The parties and the judge did not cite § 87A ¾ or make reference to it, even though there may be relevant conduct that occurred after its effective date and that may be governed by it.[10],[11]  By enacting this statute, the Legislature appears to have replaced the common-law doctrine of in pari delicto in

_____

or entity has been found to have acted fraudulently in the pending action or in another action or proceeding involving similar parties, individuals, entities and claims, and the fraud was related to the performance of the duties of the individual or firm licensed to practice public accountancy, the trier of fact shall determine:  (a) the total amount of the plaintiff's damages, (b) the percentage of fault attributable to the fraudulent conduct of the plaintiff or other party, individual or entity contributing to the plaintiff's damages, and (c) the percentage of fault of the individual or firm in the practice of public accountancy in contributing to the plaintiff's damages.  Under the circumstances set forth in this section, individuals or firms in the practice of public accountancy shall not be required to pay damages in an amount greater than the percentage of fault attributable only to their services as so determined.  This section shall not apply where a finding is made that the acts of the individual or firm in the practice of public accountancy were willful and knowing.  In such an action involving the practice of public accountancy in which a claim or defense of fraud is raised, if there is pending a separate action or proceeding in which the alleged fraudulent conduct of the same party, individuals or entity against whom the claim or defense is raised is to be adjudicated or determined, the court may stay, on its own or by motion, the action involving the practice of public accountancy until the other action or proceeding is concluded or the issue of fraudulent conduct is determined in that other action."

[10] The statute was cited and discussed in the amicus brief submitted by the Chelsea Housing Authority.

[11] Perhaps because there was no discussion of the statute, the record does not reflect whether KPMG is a firm licensed to practice public accountancy under G. L. c. 112, § 87B ½.  One would expect that it is.

cases where an accounting firm is sued for its failure to detect fraud by a client's employee, with a statutory allocation of damages akin to, but different from, comparative negligence.[12] But we do not endeavor here to interpret § 87A ¾, where the parties have not discussed it and where we have not found any appellate court opinion that has interpreted or applied it, or any legislative history that sheds light on its origin or purpose. The Superior Court, on remand, may consider the statute's application to this case, if any.

2. <u>Motion for leave to amend answer</u>. On appeal, Merrimack also challenges the Superior Court judge's decision to allow KPMG's motion for leave to amend its answer to add an affirmative defense of release, which we review for abuse of discretion. <u>Johnston</u> v. <u>Box</u>, 453 Mass. 569, 582 (2009).

"It is well established that the defense of a release must be raised as an affirmative defense and that the omission of an affirmative defense from an answer generally constitutes a waiver of that defense." <u>Sharon</u> v. <u>Newton</u>, 437 Mass. 99, 102

---

[12] One difference is that comparative negligence under G. L. c. 231, § 85, compares only the negligence attributed to all parties, but G. L. c. 112, § 87A ¾, compares the damages attributable to the plaintiff's fraudulent conduct with the damages attributable to the accounting firm's negligence. Another difference is that a plaintiff is barred from any recovery under the comparative negligence statute if its negligence is greater than the defendant's negligence, whereas a plaintiff under § 87A ¾ is entitled to recovery even if the damages attributable to its fault are greater than the damages attributable to the defendant's fault.

(2002), citing Mass. R. Civ. P. 8 (c), 365 Mass. 749 (1974). "It is equally well settled," however, "that a party may amend its pleading by leave of court and that such leave 'shall be freely given where justice so requires.'" Sharon, supra, quoting Mass. R. Civ. P. 15 (a), 365 Mass. 761 (1974). Like the plaintiff in Sharon, supra, Merrimack contends that undue delay should have led the judge to deny KPMG's motion to amend. "While we have often upheld a judge's discretion to deny leave to amend based in part on undue delay, such denials have generally been coupled with consideration of other factors such as imminence of trial and futility of the claim sought to be added." Id., citing Leonard v. Brimfield, 423 Mass. 152, 157, cert. denied, 519 U.S. 1028 (1996); Mathis v. Massachusetts Elec. Co., 409 Mass. 256, 264 (1991); Castellucci v. United States Fid. & Guar. Co., 372 Mass. 288, 292 (1977). Here, as in Sharon, we conclude that where "the amendment . . . did not raise a new issue on the eve of trial and could not be considered futile or irrelevant to [KPMG's] defense, the judge did not abuse [his] discretion in granting the motion to amend [KPMG's] answer." Sharon, supra at 102-103.

Conclusion. For the reasons stated, the order allowing KPMG's motion for summary judgment is vacated, the order allowing KPMG's motion for leave to amend its answer is affirmed, and the case is remanded to the Superior Court. On

remand, the Superior Court judge will determine whether summary judgment should be granted on any of the alternative grounds asserted by KPMG, including release.

<u>So ordered</u>.