GANTS, C.J.
**580 *713 Under the equitable common-law doctrine of in pari delicto, a plaintiff who has committed fraud cannot recover damages resulting from the negligence of an accountant in failing to detect the plaintiff's fraud, unless such relief is required as a matter of public policy. See Merrimack College v. KPMG LLP, 480 Mass. 614, 625, 108 N.E.3d 430 (2018). In Merrimack College, we held that, where the plaintiff is a corporation, it is barred under the doctrine from recovering damages for the negligence of its accounting firm in failing to detect the corporation's fraudulent conduct only if the fraud was committed by someone in its "senior management -- that is, the officers primarily responsible for managing the corporation, the directors, and the controlling shareholders." Id. at 628, 108 N.E.3d 430. But because the parties did not raise the issue, we did not decide in that case whether the Legislature by enacting G. L. c. 112, § 87A 3/4 -- which applies to conduct occurring after February 23, 2003, see St. 2001, c. 147, § 2 -- replaced the common-law doctrine of in pari delicto "in cases where an accounting firm is sued for its failure to detect fraud by a client's employee, with a statutory allocation of damages akin to, but different from, comparative negligence." Merrimack College, supra at 631, 108 N.E.3d 430.[2]
Here, the plaintiff, the Chelsea Housing Authority (CHA), has commenced this suit in the Superior Court against, among others, its former accountants, John Marotto and Martin J. Scafidi, P.C. (collectively, accountants), seeking to recover the losses it incurred from their alleged negligent failure to detect the fraudulent conduct of its former executive director, Michael E. McLaughlin,[3] and former finance director, Vitus Shum, among others. A Superior *714 Court judge granted the accountants' motions for summary judgment solely on the ground that CHA's claim of negligence **581 against them is barred by the common-law doctrine of in pari delicto -- due to the intentional misconduct of McLaughlin and Shum -- without addressing the applicability of § 87A 3/4. Because the accountants' alleged negligent conduct occurred after the effective date of § 87A 3/4, CHA's appeal from that judgment now requires us to decide the issue left unanswered in Merrimack College: whether the Legislature intended to preempt the common-law doctrine of in pari delicto in cases where an accountant is sued for failing to detect fraud committed by a client.
After careful examination of the language of that statute, viewed in the context of its legislative history, we conclude that the Legislature intended that, where a plaintiff sues an accountant for negligently failing to detect the fraudulent conduct of the plaintiff, the plaintiff may recover damages from the accountant, but only for the percentage of fault attributed to the accountant (as compared to the fault of all others whose fraudulent conduct contributed to causing the plaintiff's damages). In so doing, by necessary implication, the Legislature has preempted the common-law doctrine of in pari delicto as it applies to the negligent conduct of accountants and auditors in failing to detect fraud. We therefore vacate the grant of summary judgment and remand the case to the Superior Court for further proceedings consistent with this opinion.[4] ,[5]
Background. We summarize the relevant facts recited by the judge in granting the accountants' motions for summary judgment. Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 639, 766 N.E.2d 864 (2002). From 2000 until 2011, McLaughlin served as the executive director of CHA, which is the agency responsible for the administration of Chelsea's low income housing programs. His employment agreements -- which were executed between McLaughlin and CHA's five-member board of commissioners (board) -- established his annual salary, which began at $107,000 for the 2001 fiscal year. CHA was required to submit annual **582 budget reports to the Department of Housing and Community Development (DHCD) for approval, subject to regulatory limits on the amount by which a housing authority could increase administrative salaries.
However, McLaughlin quickly sought and obtained board approval for salary increases vastly higher than those permitted by the regulatory limits imposed by DHCD. By 2004, McLaughlin's board-approved salary had risen to $180,000; in 2008, he earned $267,199; and in 2011, his final year at CHA, the board approved a salary of $291,975. In order to avoid scrutiny from DHCD for these raises, McLaughlin stopped submitting his employment agreements to DHCD, and instead prepared and filed budget reports with deliberately falsified salary figures that fell within State regulatory guidelines. For example, McLaughlin incorrectly reported *715 salaries of $135,000 in 2004, $151,945 in 2008, and $160,415 in 2011. These budget reports were submitted to DHCD with the knowledge and approval of the CHA board.[6]
At McLaughlin's direction, CHA "misallocated and misused" Federal funds granted to CHA by the United States Department of Housing and Urban Development (HUD) under its capital funds program. Some of these Federal funds were diverted to pay McLaughlin the difference between his actual salary and the falsified figures reported to DHCD. Eventually, HUD investigators uncovered McLaughlin's excessive compensation and the misuse of Federal funds. HUD has since demanded the recapture from CHA of $2.7 million: $500,000 of excessive compensation paid to McLaughlin and $2.2 million of misused capital funds program monies.
In July 2013, McLaughlin pleaded guilty in the United States District Court for the District of Massachusetts to four counts of falsifying a record in a matter pertaining to a Federal agency, in violation of 18 U.S.C. § 1519. Each count pertained to a different fiscal year and charged McLaughlin with knowingly and falsely understating the amount of his budgeted annual salary in CHA budgets that HUD required to be submitted to State regulatory **583 authorities.[7] ,[8]
In the Superior Court action, CHA moved for summary judgment against the accountants, claiming that, based on the undisputed facts, they committed professional malpractice by failing to detect the fraud perpetrated by McLaughlin and Shum, and their negligence caused CHA to suffer substantial losses. The accountants opposed CHA's motion, asserting that there is a material dispute of fact whether they were negligent in the performance of their duties. They also cross-moved for summary judgment, claiming that -- even if they were negligent -- they are entitled to judgment under the doctrine of in pari delicto because the fraudulent conduct of McLaughlin and Shum is imputed to CHA, and an entity that committed fraud cannot recover judgment against its accountants for failing to detect that fraud.
As noted, the motion judge granted the accountants' motions for summary judgment, concluding that the doctrine of in pari delicto barred CHA from recovering damages against them even if they were negligent. The judge found that CHA was "by far the greater wrongdoer" based on the intentional misconduct of McLaughlin and Shum, whose actions, the judge held, must be imputed to CHA because those *716 actions were committed within the scope of their employment. The judge further noted that, if CHA's claims were not barred by the doctrine of in pari delicto, he would have denied the motions for summary judgment because the other arguments raised were "more appropriately dealt with at trial." The judge did not cite or make reference to G. L. c. 112, § 87A 3/4.
CHA timely appealed from the grant of summary judgment, and we allowed an application for direct appellate review.
Discussion. On appeal, CHA contends that, where, as here, the alleged negligence of the accountants occurred after February 23, 2003, the common-law doctrine of in pari delicto is preempted by **584 the statutory allocation of damages for an accountant's liability established by G. L. c. 112, § 87A 3/4. In Merrimack College, 480 Mass. at 631, 108 N.E.3d 430, we noted that "the Legislature appears to have replaced the common-law doctrine of in pari delicto in cases where an accounting firm is sued for its failure to detect fraud by a client's employee, with a statutory allocation of damages akin to, but different from, comparative negligence." But we declined to decide the issue, noting that "[t]he parties and the judge did not cite § 87A 3/4 or make reference to it." Id. at 630-631, 108 N.E.3d 430.
1. Waiver. The accountants contend that we must again decline to decide the issue, because CHA failed to argue to the motion judge that § 87A 3/4 preempts the doctrine of in pari delicto, and therefore waived its right to make the argument on appeal. Although we recognize it to be a close question, we conclude that the issue is not waived.
Underlying the purpose of the waiver doctrine is the need to give other parties -- and the courts -- fair notice that a claim or defense is being raised. See Nelson v. Adams USA, Inc., 529 U.S. 460, 469, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000) ("[waiver] principle does not demand the incantation of particular words; rather, it requires that the lower court be fairly put on notice as to the substance of the issue"). Here, both accountants raised § 87A 3/4 as a defense in their answer to CHA's amended complaint. In response, in CHA's motion for summary judgment against Marotto, CHA argued that Marotto could not invoke § 87A 3/4 to limit his liability at the summary judgment stage because the issue of his liability had not yet been determined. Marotto countered that, if he lost on summary judgment, the statute would "squarely appl[y]" to limit his liability as an accountant "where others have committed fraud." No party raised the question of preemption. However, after the issuance of the summary judgment order but before any briefs were filed in this appeal, we decided Merrimack College, where we suggested that the Legislature may have supplanted the doctrine of in pari delicto through its enactment of § 87A 3/4. Merrimack College, 480 Mass. at 631, 108 N.E.3d 430.
We are satisfied that CHA may raise this argument on appeal. The parties and the judge were indisputably on notice that the applicability of § 87A 3/4 was at issue as to CHA's claims against these defendants. Given that CHA's discussion of preemption arose out of our discussion in Merrimack College, it would make little sense to avoid deciding the issue of preemption, where the issue of the applicability of § 87A 3/4 was before the Superior **585 Court.
2. Legislative history of G. L. c. 112, § 87A 3/4. We have "long held that a statutory repeal of the common law will not be lightly inferred." Passatempo v. McMenimen, 461 Mass. 279, 290, 960 N.E.2d 275 (2012). To answer the question *717 whether a legislative act necessitates preemption of a common-law doctrine, we must first examine the history behind the act's passage in order to discern its purpose. See Lipsitt v. Plaud, 466 Mass. 240, 245-249, 994 N.E.2d 777 (2013).
Section 87A 3/4, as enacted by the Legislature in 2001, provides:
"When an individual or firm licensed to practice public accountancy under [§] 87B or 87B 1/2 is held liable for damages in a civil action arising from or related to its provision of services involving the practice of public accountancy, in which action a claim or defense of fraud is raised against the plaintiff or another party, individual or entity, and that plaintiff or other party, individual, or entity has been found to have acted fraudulently in the pending action or in another action or proceeding involving similar parties, individuals, entities and claims, and the fraud was related to the performance of the duties of the individual or firm licensed to practice public accountancy, the trier of fact shall determine: (a) the total amount of the plaintiff's damages, (b) the percentage of fault attributable to the fraudulent conduct of the plaintiff or other party, individual or entity contributing to the plaintiff's damages, and (c) the percentage of fault of the individual or firm in the practice of public accountancy in contributing to the plaintiff's damages. Under the circumstances set forth in this section, individuals or firms in the practice of public accountancy shall not be required to pay damages in an amount greater than the percentage of fault attributable only to their services as so determined. This section shall not apply where a finding is made that the acts of the individual or firm in the practice of public accountancy were willful and knowing. In such an action involving the practice of public accountancy in which a claim or defense of fraud is raised, if there is pending a separate action or proceeding in which the alleged fraudulent conduct of the same party, individuals or entity against whom the claim or defense is raised is to be adjudicated or determined, the court may stay, on its own or by motion, the action involving the practice of public accountancy until the other action or proceeding is concluded or the issue of fraudulent conduct is **586 determined in that other action."[9]
Under the terms of this statute, as noted in Merrimack College, 480 Mass. at 630, 108 N.E.3d 430, "if a plaintiff suffered damages of $1 million, and seventy per cent of those damages is attributable to the plaintiff's own fraudulent conduct while only thirty per cent is attributable to the negligence of the defendant accounting firm, the defendant shall not be required to pay more than $300,000."
A close look at the legislative history reveals that, no later than 1999, the accounting industry urged the Legislature to enact legislation that would protect accountants from being held jointly and severally liable for the entirety of damages when a client firm fails and the accountant is found negligent. Bill Would Shield CPAs from Suits When Clients Falter, Boston Globe, Feb. 11, 2000. Under a joint and several liability framework, "a plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages."[10]
*718 Shantigar Found. v. Bear Mountain Bldrs., 441 Mass. 131, 141, 804 N.E.2d 324 (2004). As articulated by a former executive director of the Massachusetts Society of Certified Public Accountants, the industry was concerned that, with joint and several liability, "[i]f there's just the slightest bit of culpability, [the accounting firm] can suffer [one hundred] percent of the loss" if it is the only one "left standing." Bill Would Shield CPAs from Suits When Clients Falter, supra.
The enormous risk to accountants arising from joint and several liability ripened as a subject of public debate in Massachusetts when, early in January 2000, the largest health maintenance organization in Massachusetts, Harvard Pilgrim Health Care (Harvard Pilgrim), was placed into receivership by order of the then Chief Justice of this court after suffering dramatic financial losses. Harvard Pilgrim in Receivership Care, Coverage Will Continue, Boston Globe, Jan. 5, 2000. Harvard Pilgrim publicly **587 blamed its financial woes -- which amounted to losses of at least $177 million in 1999 alone -- on errors in accounting practices. Id. The episode triggered a public discussion of the role of accountants and auditors in reviewing the financial well-being of large corporations, with "many officials ... calling for higher standards of fiscal accountability in the wake of the crisis," Bill Would Shield CPAs from Suits When Clients Falter, supra, and the Massachusetts Society of Certified Public Accountants calling for proportional liability that "would shield them from the fallout of failed business ventures or fraudulent lawsuits resulting from inaccurate audits," Accountants Seek Law to Protect Them from Business Failure Lawsuits, State House News Service, Mar. 22, 2001.
In February 2000, the Legislature passed a bill titled "An Act relative to the practice of public accountancy," which provided in relevant part:
"No individual or firm licensed to practice public accountancy pursuant to [§] 87B or 87B 1/2 of this act shall be held liable for any damages in any civil action arising from, or related to, their provision of services involving the practice of public accountancy unless such damages are found to be solely the direct and proximate result of the actual conduct of the individual or firm."
1999 Senate Doc. No. 368. When the bill arrived at the desk of then Governor Paul Cellucci, however, he declined to sign it. Recognizing that this proposed legislation did not enact proportional liability for accountants, but instead protected accountants from any liability unless their negligence was the sole cause of the client firm's losses, the Governor responded to the Legislature in a letter dated February 11, 2000, writing:
"The purpose of this legislation, as articulated by its proponents, is to replace joint and several liability for accountants with proportionate liability. The bill is not intended to change the current standard of accountant professional liability, but only to apportion an accountant's responsibility to pay damages in direct proportion to his fault.
"I am sympathetic to the principle underlying this bill that, in some cases, it would be more equitable to limit a tortfeasor's *719 responsibility to pay damages in proportion to his fault, **588 rather than to impose on a single tortfeasor the responsibility to pay all damages, including those caused by the fault of others. I am concerned, however, that, as drafted, this bill could have the broader effect of changing our current standard of accountant professional liability by severely narrowing the scope of conduct and damages for which accountants may be held liable. Such a result would be especially troubling given the critical role that accountants play in our complex system of commerce and the extensive reliance that individuals, businesses, and government place on the expertise they provide. I therefore recommend that this bill be amended to more clearly limit its effect to its stated purpose."
2000 Senate Doc. No. 2096, at 1. The Governor returned the bill to the Legislature with a suggested amendment that provided in relevant part:
"When an individual or firm licensed to practice public accountancy pursuant to [§] 87B or 87B 1/2 is held liable for damages in a civil action arising from, or related to, its provision of services involving the practice of public accountancy, there shall be a determination by the trier of fact both of (1) the total amount of each plaintiff's damages, and (2) the percentage of fault of the individual or firm in contributing to each plaintiff's damages. No individual or firm shall be required to pay damages in an amount greater than the percentage of fault as so determined. This section shall not apply where a finding is made that the acts of the individual or firm were willful and knowing."
Id. at 2. The Governor's proposed language, rather than protecting accountants from any liability for their negligence except where they are proved to be the sole cause of damages, would have replaced the common law of joint and several liability for accountants with proportional liability, limiting the amount of damages that accountants would pay if found liable for negligence in a civil action to their percentage of fault. The Legislature did not take any further action on the matter in 2000.
In early 2001, in the new legislative session, the Senate reintroduced the public accountancy bill, reflecting the Governor's proposed language. See 2001 Senate Doc. No. 402. In late September 2001, the bill was referred to the House, which on November 5, 2001, proposed an amendment to the bill's language.
**589 The House amendment dramatically limited the bill's reach to circumstances "involving the practice of public accountancy wherein a claim or defense of fraud is raised against the ... plaintiff or another party ... and said party ... has been found to have acted fraudulently in the pending action or in any other action or proceeding involving similar parties." 2001 House Doc. No. 4718.[11] In short, while the bill proposed by the Governor and referred by the Senate provided for proportional liability for accountants in all civil cases, the amended House bill limited the application of proportional liability for accountants to cases where a defense or claim of fraud is raised against the plaintiff or any other party, person, or entity, and one or more of them is found to have acted fraudulently. It was this House bill, not the earlier Senate bill reflecting the Governor's suggested amendment, that was ultimately enacted *720 by the Legislature and signed into law by then Acting Governor Jane Swift on November 25, 2001. St. 2001, c. 147.
The legislative history is silent as to why the Legislature decided in the late fall of 2001 to limit the scope of proportional liability for accountants to cases where the accountant committed negligence and others committed fraud. But it is noteworthy that in October 2001, Enron Corporation (Enron), once "the world's dominant energy trader," began to face significant scrutiny in nationwide media reports regarding its internal financial crisis. Once-Mighty Enron Strains Under Scrutiny, N.Y. Times, Oct. 28, 2001. After Enron's reported third quarter earnings statements failed to reflect a $1.2 billion reduction in shareholder equity, many began pointing fingers at Enron's accounting practices. See id. Although the company's chief executive officer tried to reassure investors that auditors from Arthur Andersen LLP -- Enron's accounting firm -- "had carefully reviewed Enron's reporting," the public was aware by mid-October that the United States Securities and Exchange Commission (SEC) was expected to look into "the sophisticated financing techniques used by the company [that] might be effectively keeping losses off the earnings statement." Enron Tries to Dismiss Finance Doubts, N.Y. Times, Oct. 24, 2001. Within days, on October 30, the SEC
**590 opened a formal investigation into Enron's practices and sent a letter to Enron requesting accounting documents. Arthur Andersen LLP v. United States, 544 U.S. 696, 701, 125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005). The episode raised concerns that accountants, without sufficient incentive to report misdeeds by clients, would "[take] an overly partisan approach, approv[e] highly questionable deals and grossly exaggerat[e] [their clients'] financial strength." Rostain, Pockets of Professionalism, 54 Stan. L. Rev. 1475 (2002).
We often say that, in interpreting the meaning of a statute, we seek to effectuate the intent of the Legislature, "ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." DiFiore v. American Airlines, Inc., 454 Mass. 486, 490, 910 N.E.2d 889 (2009), quoting Industrial Fin. Corp. v. State Tax Comm'n, 367 Mass. 360, 364, 326 N.E.2d 1 (1975). In ascertaining why the Legislature began the 2001 session with a bill intended to replace joint and several liability for accountants with proportional liability, yet ultimately passed a bill that provided for proportional liability only where the plaintiff (or another party, person, or entity who contributed to the plaintiff's damages) committed fraud, it is reasonable to infer that -- as the Enron scandal began to unravel -- the "mischief or imperfection" the Legislature sought to remedy included not only the potential unfairness to accountants of joint and several liability, but also the need to hold accountants accountable for negligently failing to detect and reveal financial fraud committed by their client and its officers.
3. Preemption. CHA contends that the Legislature has supplanted the common-law doctrine of in pari delicto by enacting G. L. c. 112, § 87A 3/4. It is a "settled rule of statutory construction that '[a] statute is not to be interpreted as effecting a material change in or a repeal of the common law unless the intent to do so is clearly expressed.' " Riley v. Davison Constr. Co., 381 Mass. 432, 438, 409 N.E.2d 1279 (1980), quoting Pineo v. White, 320 Mass. 487, 491, 70 N.E.2d 294 (1946). Such intent may be "clearly expressed"
*721 in one of two ways: by words in the statute itself clearly stating that the statute supersedes the common law, or by "necessary implication." See Lipsitt, 466 Mass. at 244, 994 N.E.2d 777, quoting Eyssi v. Lawrence, 416 Mass. 194, 199-200, 618 N.E.2d 1358 (1993) ("It is well established that 'an existing common law remedy is not to be taken away by statute unless by direct enactment or necessary implication' "). Cf.
**591 George v. National Water Main Cleaning Co., 477 Mass. 371, 378, 77 N.E.3d 858 (2017), quoting Commonwealth v. Harris, 443 Mass. 714, 725, 825 N.E.2d 58 (2005) ("[A] statute is not to be deemed to repeal or supersede a prior statute in whole or in part in the absence of express words to that effect or of clear implication").
There are no words in § 87A 3/4 expressly stating that the statute was intended to repeal the in pari delicto doctrine as applied to the negligent failure of accountants to detect and reveal fraudulent conduct. Nor have we found any legislative history that indicates that the Legislature considered, or even knew of, the in pari delicto doctrine when it enacted § 87A 3/4. But a common-law rule may be replaced or amended by the Legislature even where "there is no indication of legislative intent to preempt the common law" if the enacted statute preempts the common law by "necessary implication." See Lipsitt, 466 Mass. at 247, 994 N.E.2d 777, quoting Eyssi, 416 Mass. at 199-200, 618 N.E.2d 1358. A statute preempts a common-law doctrine by necessary implication where the doctrine "is so repugnant to and inconsistent with" the statute that "both cannot stand." See George, 477 Mass. at 378, 77 N.E.3d 858, quoting Commonwealth v. Hayes, 372 Mass. 505, 511, 362 N.E.2d 905 (1977). See also Skawski v. Greenfield Investors Prop. Dev. LLC, 473 Mass. 580, 586, 45 N.E.3d 561 (2016) (implied repeal may "be clear where the subsequent legislation comprehensively addresses a particular subject and impliedly supersedes related ... common law that might frustrate the legislative purpose"). "[T]he question is one of practicality." Lipsitt, supra. Can the common-law doctrine and the statute reasonably coexist in harmony, or must the common-law doctrine necessarily give way in order to effectuate the purpose of the statute? To better illustrate this process, we examine the effect that all three proposed bills before the Legislature would have had on the doctrines of in pari delicto and joint and several liability.
a. The 2000 bill. The bill that initially reached Governor Cellucci's desk could have coexisted in harmony with the common-law doctrine of in pari delicto. As noted supra, that bill provided that no licensed accountant or accounting firm "shall be held liable for any damages in any civil action arising from, or related to, their provision of [accounting] services unless such damages are found to be solely the direct and proximate result of the actual conduct of the individual or firm." Under the in pari delicto doctrine, if a plaintiff had engaged in intentional conduct -- including fraudulent conduct[12] **592 -- a defendant accountant who negligently failed to detect that fraud would not be liable for damages arising from the fraud. Under the framework imposed by the bill, the result would be the same; because of the plaintiff's fraudulent conduct, the plaintiff's *722 damages would not "be solely" the result of the accountant's conduct, and the accountant would not be held liable. Accordingly, the first bill and the in pari delicto doctrine would have coexisted without conflict.
However, this first bill could not have coexisted in harmony with the common-law doctrine of joint and several liability, and by necessary implication, would have preempted -- for accountants only -- that common-law doctrine. Under the doctrine of joint and several liability, if an accountant and another defendant were both found to be negligent, each would be jointly and severally liable to pay the judgment; if the other defendant were unable to pay, perhaps because of bankruptcy, the accountant would be responsible alone to pay the entirety of the judgment. But under the bill's provisions, if an accountant and another defendant were both found to be negligent, the accountant would not be liable for damages and the other defendant would be responsible alone to pay the entirety of the judgment.
b. The bill proposed by the Governor. The bill recommended by Governor Cellucci also could have coexisted in harmony with the common-law doctrine of in pari delicto. As noted supra, that bill provided that accountants found liable for negligence in their performance of accounting services would pay proportional damages no greater than their percentage of fault. In cases where the plaintiff had committed fraud and the accountant had committed negligence, the doctrine of in pari delicto would have resulted in the accountant not being found liable, so the proportional liability provision of the bill would not apply. The bill and the doctrine thus would not overlap in practice, and could have coexisted side by side.
But the bill's proportional liability provision would apply to limit the amount of damages that an accountant would be required to pay where the plaintiff had not engaged in fraud, and the accountant and other defendants were found negligent. In these **593 cases, under the doctrine of joint and several liability, the accountant would be responsible to pay the entirety of the judgment if the other defendants were unable to pay. Under proportional liability, the accountant would be responsible to pay damages only in proportion to his or her share of liability. Therefore, by necessary implication, the bill would have preempted -- for accountants only -- the common-law doctrine of joint and several liability.
c. G. L. c. 112, § 87A 3/4. As discussed supra, neither of the first two bills before the Legislature ever became law. Instead, the Legislature enacted as G. L. c. 112, § 87A 3/4, a bill dramatically different in its text and, as a result, in its legal implications. We conclude that § 87A 3/4 cannot coexist in harmony with the common-law doctrine of in pari delicto. Section 87A 3/4 provides for proportional liability for accountants only where others have committed fraud and the accountants did not, and expressly provides that "the percentage of fault attributable to the fraudulent conduct of the plaintiff ... contributing to the plaintiff's damages" shall be included in the calculation of proportional liability. If the doctrine of in pari delicto applied in these circumstances, the accountant who negligently failed to detect fraud by a client would never be held liable, so there would never be occasion to include "the percentage of fault attributable to the fraudulent conduct of the plaintiff" in the calculation of the accountant's proportional liability. The doctrine must yield, because if we held otherwise, the statute's express intent to govern circumstances where "a plaintiff ... [has] acted fraudulently" would be rendered superfluous. G. L. c. 112, § 87A 3/4. See *723 Connors v. Annino, 460 Mass. 790, 796, 955 N.E.2d 905 (2011), quoting Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594, 601, 925 N.E.2d 9 (2010), S.C. 465 Mass. 297, 988 N.E.2d 845 (2013) ("We ... endeavor to interpret a statute to give effect 'to all its provisions, so that no part will be inoperative or superfluous' "). By limiting proportional liability to cases where fraud is found and by including the plaintiff's fraud in the calculation of proportional liability, the Legislature, by necessary implication, has preempted the common-law doctrine of in pari delicto in cases where an accountant is found liable for failing to detect and reveal a plaintiff's fraud.[13]
For example, imagine a case where the fraudulent financial **594 machinations of a corporation's president and chief financial officer leave a corporation in ruins, and its accounting firm negligently fails to detect the fraud (or fails to reveal it for fear of reprisal by the client). If the corporation's new executive leadership seeks to recover damages from the accounting firm for its professional malpractice, the accounting firm may be held liable under § 87A 3/4, but would be responsible only for damages reflecting its proportional liability. This result is consistent with the apparent intent of a Legislature that wanted to protect accountants from joint and several liability where they negligently failed to detect fraud, but also wanted accountants held accountable to a proportional degree for professional malpractice in failing adequately to address the fraudulent conduct of their clients -- such as Enron.
The accountants highlight one aspect of our interpretation that they contend is unreasonable. They ask us to imagine a case where more than fifty percent of the fault is attributable to the conduct of the plaintiff. They note that, if § 87A 3/4 preempts the common-law doctrine of in pari delicto, a plaintiff who engaged in fraudulent conduct could recover proportional damages from a negligent accountant under § 87A 3/4, but a plaintiff who engaged in negligent conduct could not recover any damages from a negligent accountant under the comparative negligence statute. See G. L. c. 231, § 85 ; Merrimack College, 480 Mass. at 624, 108 N.E.3d 430. It is true that "[w]e assume the Legislature intended to act reasonably," and thus we "will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable." Attorney Gen. v. School Comm. of Essex, 387 Mass. 326, 336, 439 N.E.2d 770 (1982). But we do not consider it to be absurd or unreasonable for the Legislature to want accountants to be particularly vigilant in detecting fraud and to fear the possibility of liability, albeit liability proportional to their relative fault, at least as much as they may fear reprisal from a client for revealing the fraud.
**595 It is plain from the statutory revisions that ultimately resulted in the enactment of § 87A 3/4 that -- perhaps because of the *724 publicity arising from the Enron scandal -- the Legislature was focused on accountants' revelation of their clients' fraud, not their clients' negligence, because the statute applies only where there is a finding of fraudulent conduct. The need for accountants to fear the threat of liability is greater where a client's conduct is fraudulent rather than simply negligent, because fraudulent conduct is intentional (and potentially criminal), and an accountant's revelation of the conduct will not likely be welcomed by the client. It is not absurd or unreasonable to surmise that the Legislature simultaneously addressed two concerns -- accountants' concern about the unfairness of joint and several liability, and the public policy concern about the need to hold accountants accountable for their negligent failure to call out their clients' fraud -- without also taking on the law of comparative negligence. But it would be absurd and unreasonable to conclude that the Legislature enacted § 87A 3/4, which by its plain terms established how to calculate proportional liability where the plaintiff engaged in fraudulent conduct and the accountant was negligent, but intended that such a calculation would never actually be applied against a plaintiff because the in pari delicto doctrine would always shield an accountant from liability in these circumstances. We cannot endorse such a reading of the statute. See Casseus v. Eastern Bus Co., 478 Mass. 786, 801, 89 N.E.3d 1184 (2018) ("An interpretation that causes a statute to have ... no practical effect ... is absurd" [quotation and citation omitted] ).
Conclusion. Because the Superior Court judge's grant of summary judgment to the accountants rested solely on his application of the in pari delicto doctrine, and because we conclude that, for conduct that occurred after February 23, 2003, the doctrine is preempted by G. L. c. 112, § 87A 3/4, in cases where an accountant is alleged to have negligently failed to detect a client's fraudulent conduct, we vacate the grant of summary judgment and remand the case to the Superior Court for further proceedings consistent with this opinion.
So ordered.

In Merrimack College v. KPMG LLP, 480 Mass. 614, 629, 108 N.E.3d 430 (2018), we concluded that the financial aid director at Merrimack College, who had committed fraud, could not be deemed a member of senior management of the college, and so the college was not barred by the common-law doctrine of in pari delicto from recovering damages from its accounting firm. Perhaps because most of the relevant conduct in Merrimack College occurred before the effective date of G. L. c. 112, § 87A 3/4, the parties did not discuss the statute. See id. at 631-632, 108 N.E.3d 430.

Michael E. McLaughlin, a defendant below, is not a party to this appeal.

Accordingly, we do not reach any other issues raised by the parties, such as whether, as a matter of public policy, we would carve out an exception to the in pari delicto doctrine in cases where a public authority seeks to recover damages from its accountant and auditor for their alleged negligence in failing to detect fraudulent conduct committed by members of senior management. See Merrimack College, 480 Mass. at 625, 108 N.E.3d 430.

We acknowledge the amicus briefs submitted by the Department of Housing and Community Development, and by the American Institute of Certified Public Accountants and Massachusetts Society of Certified Public Accountants.

In the same action brought against John Marotto and Martin J. Scafidi, P.C. (collectively, accountants), the Chelsea Housing Authority (CHA) individually sued each member of the board of commissioners who served during Michael E. McLaughlin's tenure as executive director. The commissioners' motion to dismiss was allowed because, as board members of a public agency who had not engaged in malfeasance, they were statutorily immune from suit. See G. L. c. 121B, § 13. CHA does not challenge the dismissal on appeal.

McLaughlin also pleaded guilty in a separate indictment in the United States District Court for the District of Massachusetts to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, for conspiring with a contractor to receive advance notice of the housing units that would be subject to random inspection by the United States Department of Housing and Urban Development, which enabled CHA to repair the units before the inspection. It is not clear whether any damages to CHA were alleged to have resulted from this inspection-rigging scheme.

On March 5, 2019, the Superior Court judge in this action granted CHA's motion for summary judgment against McLaughlin as to liability. The judge entered an order awarding $1,187,460.44 to CHA, plus interest and costs.

There is no dispute that the accountants are licensed to practice public accountancy in Massachusetts and therefore are within the scope of the statute.

"Massachusetts retains the traditional principle of joint and several liability in tort cases" as part of the common law. Glannon, Liability of Multiple Tortfeasors in Massachusetts: The Related Doctrines of Joint and Several Liability, Comparative Negligence and Contribution, 85 Mass. L. Rev. 50, 50 (2000). In contrast, under the concept of proportional or "several" liability, adopted in some jurisdictions, "each would pay [only] according to her percentage of fault." Id. at 52 n.12. "Significantly, Massachusetts has declined previous opportunities to eliminate joint and several liability ... in favor of imposing fault-based liability on all parties." Shantigar Found. v. Bear Mountain Bldrs., 441 Mass. 131, 142, 804 N.E.2d 324 (2004).

The Senate further amended the bill on November 13, 2001, adding another qualifier to make clear that the law would only apply where the alleged fraud of the plaintiff or other person "was related to the performance of the duties of the individual or firm licensed to practice public accountancy." 2001 Senate Doc. No. 2174.

"Under the common law, fraud is a knowing false representation of a material fact intended to induce a [person] to act in reliance, where the [person] did, in fact, rely on the misrepresentation to his [or her] detriment." Fordyce v. Hanover, 457 Mass. 248, 257, 929 N.E.2d 929 (2010). See Balles v. Babcock Power Inc., 476 Mass. 565, 573, 70 N.E.3d 905 (2017) (describing elements of fraud).

To be sure, there are circumstances in which the common-law doctrine of in pari delicto and G. L. c. 112, § 87A 3/4, could exist side by side. For instance, there are cases in which the statute would apply but the in pari delicto doctrine would not, such as where the fraudulent conduct is committed by "[another] party, individual or entity contributing to the plaintiff's damages," but not by the plaintiff or by a person whose conduct is imputed to the plaintiff. G. L. c. 112, § 87A 3/4. See Merrimack College, 480 Mass. at 627-628, 108 N.E.3d 430. But this does not undermine our holding where the heart of the statute establishes a formula to allocate proportional damages in cases where "a plaintiff ... [has] acted fraudulently," G. L. c. 112, § 87A 3/4, thus directly conflicting with the doctrine. The fact that the statute reaches beyond the scope of a plaintiff's conduct does not affect our preemption analysis.