NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-1168                                          Appeals Court

BOARD OF SELECTMEN OF PEPPERELL  vs.  ZONING BOARD OF APPEALS OF
        PEPPERELL & another[1] (and a consolidated case[2]).

No. 22-P-1168.

Suffolk.     December 5, 2023. – April 12, 2024.

Present:  Green, C.J., Neyman, & Englander, JJ.

Dump.  Municipal Corporations, Dump, By-laws and ordinances.
    Zoning, Dump, Accessory building or use, By-law.
    Declaratory Relief.  Practice, Civil, Declaratory
    proceeding, Summary judgment.

Civil actions commenced in the Land Court Department on
February 14 and 15, 2019.

After consolidation, the cases were heard by Diane R.
Rubin, J., on motions for summary judgment.

Christine E. Dieter for Mass Composting Group Inc., &
another.
David K. McCay for board of selectmen of Pepperell.
Jonathan M. Silverstein for Phillip Dzubinski & others.

---

[1] Mass Composting Group Inc.

[2] Phillip Dzubinski & others vs. Zoning Board of Appeals of
Pepperell & others.

GREEN, C.J.  Mass Composting Group Inc. (MCGI) proposes to conduct a soil reclamation project on a former gravel pit in the town of Pepperell (town).  As described by MCGI, the project would entail depositing soils and materials on the property over a seven to nine year period to prepare the property for future development.  On motions for summary judgment, a judge of the Land Court concluded and declared that section 277 of chapter 165 of the acts of 2014 (§ 277) does not preempt the town's authority to regulate the proposed project, and that the proposed project constitutes a commercial dumping ground as defined in the local zoning bylaw -- a use prohibited in the industrial zoning district in which the property is located.  MCGI appeals, and we vacate the judgment.  We remand for the entry of a declaratory judgment consistent with this opinion and for further consideration of whether the proposed project is a use prohibited by the bylaw.

Background.  1.  The locus and project.  The site at issue consists of forty-nine acres located in the town's industrial zoning district, and was the site of a gravel pit or quarry between 1965 and the late 1980s.  There is no current gravel removal operation, or other active use, conducted on the site.[3]

---

[3] A three-year special permit was granted for soil and gravel removal in 1985.  The board of selectmen (board) issued a new special permit for gravel removal in 1991, but it was

MCGI seeks to "reclaim" the property by a project that will deposit approximately 3.2 million cubic yards of "soil" over a seven to nine year period.  The project would include installation of a scale house, electrical utilities, fencing, and monitoring wells.  The soil deposits would be comprised of "excess soil from excavation and construction projects in Massachusetts," and "qualified soils" from Vermont, New Hampshire, and Maine.  Approximately sixty-five truckloads a day would be deposited, bulldozers would flatten the soil, and the process would be repeated to achieve a final elevation.  MCGI's stated purpose of the proposed project is "to improve current topographic conditions by restoring elevations to pre-quarrying conditions, install a sustainable vegetative cover[,] and prepare the property for future development."  MCGI has not identified a specific future use, though a solar farm has been discussed.

Prior to quarrying activities, the elevation of the property ranged from 170 to 260 feet above sea level, with the majority of the site at over 200 feet in elevation.  Current topography ranges between 172 to 260 feet above sea level; Nashua Road, which fronts the western and northern edges of the property, is 195 to 220 feet above sea level.  The project's

---

subsequently revoked in 1992.  The record does not reflect that any further permitting for gravel removal currently exists.

proposed finished grade will be a flat plateau of fourteen to seventeen acres at 299.5 feet above sea level, an apparent deviation from the project's stated purpose that we will discuss later in this opinion.

The owners of the originating sites will pay MCGI to deposit excess soil and fill material on the site.  If it were not being paid, MCGI would not take the soil.  The proposed project, as designed, would generate $20 to $25 million in revenue for MCGI over the course of the project.

2.  <u>Legislation and agency policy</u>.  In 2014, the Legislature directed the Department of Environmental Protection (department) to establish "regulations, guidelines, standards[,] or procedures for determining the suitability of soil used as fill material for the reclamation of quarries, sand pits[,] and gravel pits."  § 277.  Section 277 provides

> "[t]he regulations, standards[,] or procedures shall ensure the reuse of soil poses no significant risk of harm to health, safety, public welfare[,] or the environment considering the transport, filling operations[,] and the foreseeable future use of the filled land.  The department <u>may</u> adopt, amend[,] or repeal regulations establishing: (1) classes or categories of fill or reclamation activities requiring prior issuance of a permit issued by the department; (ii) classes or categories of fill or reclamation activities that may be carried out without prior issuance of a permit issued by the department; and (iii) classes or categories of fill that shall require local approval based on the size, scope[,] and location of a project" (emphasis added).

In response, the department adopted an interim policy under the authority of § 277.  See "Interim Policy on the Re-Use of Soil for Large Reclamation Projects Policy #COMM-15-01" (August 28, 2015) (interim policy).  See also the department's "Similar Soils Provision Guidance," WSC#-13-500 (Sept. 4, 2014).  The interim policy sets out the procedure by which the department will review quarry reclamation proposals, stating, inter alia, that its purpose is to provide

> "notice of [the department's] intent to issue site-specific approvals, in the form of an Administrative Consent Order, to ensure [that] the reuse of large volumes of soil for reclamation of . . . quarries poses no significant risk of harm to health, safety, public welfare[,] or the environment and would not create new releases or threats of releases of oil or hazardous materials."

Among other things, the interim policy requires that soil accepted by the quarry "can contain no more than de minimis quantities of Solid Waste (e.g.[,] Municipal Solid Waste and/or Construction and Demolition Waste) as defined in 310 C[ode] M[ass.] R[egs.] [§] 16.00 [2012] and 310 C[ode] M[ass.] R[egs.] [§] 19.00 [2014]."[4]  Further, projects "must ensure that the filling does not create new, reportable releases of oil or hazardous materials to the environment."

Finally, the interim policy specifically provides that

---

[4] These regulations define "Construction and Demolition Waste," and "Municipal Solid Waste," see 310 Code Mass. Regs. § 16.02 (2012) and 310 Code Mass. Regs. § 19.006 (2014), but do not define the term "de minimis."

"[n]othing in this Interim Policy eliminates, supersedes[,] or otherwise modifies any local, [S]tate[,] or [F]ederal requirements that apply to the management of soil, including any local, [S]tate[,] or [F]ederal permits or approvals necessary before placing the soil at the receiving location, including, but not limited to, those related to placement of fill, noise, traffic, dust control, stormwater management, wetlands, groundwater[,] or drinking water source protection."[5]

The interim policy anticipates that the developer will work closely with local authorities and respond appropriately to their comments "on project impacts related to noise, dust, odor and/or trucks."  In addition, the interim policy requires a "plan for communicating with the public and involving interested parties at key points in the implementation of the reclamation project."[6]

3.  Local zoning.  The local zoning bylaw (bylaw) contains a "Table of Principal Uses."  See Pepperell zoning bylaw,

---

[5] The interim policy provides that it will stay in effect until regulations are adopted, and that projects commenced under an administrative consent order would be accommodated by any regulations subsequently adopted.  Counsel for MCGI confirmed at oral argument that no relevant regulations have yet been adopted.

[6] The project, as proposed, would comply with the interim policy requirements and ongoing soil testing, and screening would occur to ensure the suitability of the deposits before they are made.  MCGI indicated at oral argument that, although it had submitted a request for approval of the project to the department, the department has suspended its review of that request until this action is resolved.  For purposes of these declaratory judgment actions, we will assume that any project executed by MCGI will obtain an appropriate administrative consent order from the department before it commences.

Appendix A, as revised July 28, 2014. A soil reclamation facility is not a use listed in the table. Id. Pursuant to the bylaw's table of principal uses, a commercial dumping ground is not allowed in any zoning district in the town. Id. The bylaw defines a "commercial dumping ground" as a "disposal site for garbage, rubbish, the deposit of demolition materials or other refuse[,] or as a site for a refuse disposal incinerator." Id. at § 10000.

4. Procedural history and Land Court decision. Cleared of the underbrush, before us are the parties' requests for declaratory judgment pursuant to G. L. c. 231A and G. L. c. 240, § 14A.[7] All of the parties, whether in a complaint or

---

[7] The case followed a convoluted path to reach us for review. On September 24, 2018, the board of selectmen (board) requested that the building inspector determine whether the proposed project qualifies as a "commercial dumping ground" and whether a commercial dumping ground is an allowed use of the property. Although the building inspector determined that the proposed project constitutes a commercial dumping ground, the town's zoning board of appeals (zoning board) disagreed, and the board thereafter commenced an action challenging the zoning board's decision pursuant to G. L. c. 40A, § 17. A group of town residents, mostly abutters and referred to as the "private plaintiffs," among other things (residents), also commenced a similar action pursuant to G. L. c. 40A, § 17. After the two cases were consolidated, a judge suggested that the zoning board was without jurisdiction to review that building inspector's determination, so that the § 17 appeals were inapt as a means to consider the question. Instead, she suggested that the parties' dispute should more appropriately be resolved by amended complaints under G. L. c. 240, § 14A. Accordingly, by third amended complaint, the residents sought, among other things, a declaratory judgment, pursuant to G. L. c. 231A and G. L. c. 240, § 14A, that the zoning board's decision did not

counterclaim, have sought a declaration as to whether the proposed project is prohibited as a "commercial dumping ground" or because the proposed use constitutes a use that is not otherwise allowed in the town. Although G. L. c. 240, § 14A, does not authorize the board of selectmen (board) to bring a declaratory judgment action,[8] MCGI unquestionably has the right to obtain a declaratory judgment that will resolve doubts as to the requirements of the zoning bylaw as applied to its property,

_____

establish that the proposed project was an allowed use under the town's zoning bylaw. In its second amended complaint, the board added a count seeking a declaratory judgment, pursuant to G. L. c. 231A, that the project is a prohibited use under the bylaw, and a declaratory judgment pursuant to G. L. c. 240, § 14A, that the proposed project is prohibited because it constitutes a commercial dumping ground and is not otherwise allowed under the zoning bylaw. In its answer to the board's second amended complaint, MCGI asserted two counterclaims -- the first seeking a declaratory judgment pursuant to G. L. c. 231A, § 1, that the project does not constitute a "commercial dumping ground," and that § 277 preempts the bylaw, and the second seeking a declaratory judgment, pursuant to G. L. c. 240, § 14A, that the project would not constitute a "use" under the bylaw. Ruling on cross motions for summary judgment by the board and the residents -- and with the parties stipulating to the dismissal of their G. L. c. 40, § 17, appeals -- the judge concluded that the project was a commercial dumping ground, and that § 277 did not preempt the town's authority to regulate the project. Summary judgment entered in favor of the board and the residents on all claims. Accordingly, no issues relevant to an appeal under § 17 are before us, and only the parties' claims for declaratory relief and judgment are before us.

[8] We also note that the board ordinarily would not be entitled to a declaratory judgment concerning an interpretation of the bylaw under G. L. c. 231A. See Leonard v. Zoning Bd. of Appeals of Hanover, 96 Mass. App. Ct. 490, 500 (2019).

and the board is the appropriate party defendant in any such action.[9]  See G. L. c. 240, § 14A; Whitinsville Retirement Soc'y, Inc. v. Northbridge, 394 Mass. 757, 762-763 (1985).  The issue, therefore, is properly before us and we proceed to consider it.

The judge identified the issues before her as whether the project would be lawful under the bylaw and whether § 277 and the interim policy preempt the local bylaw.  Where the soil management plan allows up to five percent by volume of asphalt, brick, and concrete material, and up to one percent of ash or solid waste, the judge concluded that the deposits are reasonably characterized as trash or garbage.  The judge rejected the idea that only de minimis amounts of such prohibited materials would be deposited; she calculated that, based on the scope of the proposed project, up to 192,000 cubic yards of prohibited materials would be deposited in total.  She concluded that the department's limitation of "de minimis" amounts of prohibited materials is irrelevant where the bylaw's definition of commercial dumping ground does not contain a qualifying threshold amount of prohibited materials.  The judge

---

[9] The residents, too, have authority under G. L. c. 240, § 14A, to challenge a bylaw interpretation to the extent "there is a direct effect of the zoning enactment through the permitted use of other land."  Hansen & Donahue, Inc. v. Norwood, 61 Mass. App. Ct. 292, 295 (2004), quoting Harrison v. Braintree, 355 Mass. 651, 655 (1969).

ultimately concluded that the proposed project would constitute a commercial dumping ground, prohibited by the town's bylaw.

The judge also concluded that § 277 and the interim policy do not preempt local bylaws from prohibiting the filling of quarries with reclaimed soil. The judge reasoned that "[w]hile [§ 277] does contemplate uniform standards for determining the suitability of fill for the reclamation of quarries, sand pits[,] and gravel pits, it stops short of explicitly limiting the manner in which cities and towns may also act to regulate land within their boundaries."

Having concluded that the project constitutes an impermissible commercial dumping ground, the judge declined to consider whether, as the board argued, (1) the project would only be an allowable "accessory or incidental use to a quarry or gravel pit" if the primary use were allowed under the bylaw; (2) where the bylaw prohibits uses not expressly permitted, the project falls under no allowed use category; and (3) the project requires a water resource protection overlay district special permit, which MCGI has not obtained.

Discussion. 1. Commercial dumping ground. We first consider whether the proposed project will constitute a "commercial dumping ground," defined in the bylaw as a site for the disposal of "garbage, rubbish, . . . demolition materials[,] or other refuse." Pepperell zoning bylaw § 10000. The bylaw

does not contain specific definitions of the latter terms, but "[w]e construe the meaning of a bylaw using 'ordinary principles of statutory construction,' beginning with the plain language of the bylaw" (citation omitted).  Williams v. Board of Appeals of Norwell, 490 Mass. 684, 693 (2022).

Because of the posture in which these issues come before us (i.e., before review and approval by the department under its interim policy), we will assume that the proposed project, as eventually executed, will comply with § 277 and the interim policy and will be approved by the department.[10]  Thus, our review assumes that the department will determine that, as to any project it approves, there is no "significant risk of harm to health, safety, public welfare[,] or the environment[,]" see § 277, and only "de minimis quantities of Solid Waste" will be deposited, see interim policy.[11]  Further, as provided in the interim policy, the department will ensure that the project will "not create new, reportable releases of oil or hazardous materials to the environment."  Rather than quibble about the meaning of commonly used terms such as garbage, rubbish, and

---

[10] In other words, we presume that, since such approval is required by the department's interim policy, no quarry reclamation project will proceed unless and until it receives such approval.

[11] We offer no opinion on whether the department will in fact grant its approval to the proposed project.

refuse as used in the bylaw, we accept that "de minimis" quantities of such materials as described in § 277 and the interim policy will be deposited on the site pursuant to the proposed project. That does not mean, however, that the inclusion in the soils used as fill in the quarry reclamation project of de minimis quantities of materials that might be described as "refuse," in some sense of the term, will cause the site to be considered a "commercial dumping ground" within the meaning of the bylaw.

In the context of the proposed project, a number of factors lead us to conclude that the proposed project will not constitute a commercial dumping ground (assuming, again, that only a de minimis quantity of harmful materials are deposited). Section 277 and the interim policy act together to ensure that the soils deposited at the project site will pose "no significant risk of harm to health, safety, public welfare[,] or the environment." § 277. Indeed, as we read it, the very purpose of § 277 and the interim policy is to ensure, in effect, that a quarry is not used as a commercial dumping ground. The department's interim policy seems to recognize, however, that it would be difficult, if not impossible, to fill a quarry with soil and materials that do not include any materials that, in bulk, could put the health, safety, public welfare, or the environment at risk. Thus, the statutory framework engages the

department in making a determination of whether any such materials are "de minimis," and any project approved by the department will of necessity conform to that standard. We conclude that the department's approval of the composition of soils deposited on the site, based on its determination that the soils are appropriate for use as fill, means that the soils are not "garbage" or "refuse" within the meaning of the bylaw, and their use as fill material accordingly does not transform the former quarry into a commercial dumping ground.[12]

-----

[12] We do not intimate that the department is the arbiter of the meaning of the term "commercial dumping ground" in the town's bylaw for all purposes, or that the town is without authority to impose more stringent standards. Instead, in the circumstances of the present case, and in light of the department's oversight of the composition of soils used in quarry reclamation projects in the Commonwealth, and in the absence of any definition of the terms "garbage, rubbish, the deposit of demolition materials or other refuse" within the definition of the term "commercial dumping ground" in the town's bylaw, our conclusion applies the department's review of quarry reclamation projects under the interim policy as an interpretive aid to construe the bylaw provision. We note as well that this is not a situation in which we are admonished to defer to an interpretation by a local administrative body charged with enforcement of the bylaw. See Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 381 (2009). As we observed earlier, see note 7, supra, the case is before us on requests for declaratory judgment; the parties stipulated to the dismissal of an action that would have presented the question of the propriety of the interpretation by the zoning board (consistent with ours) that the proposed project would not constitute a commercial dumping ground within the meaning of the bylaw. Our view of the case, resting on interpretation of the bylaw, obviates any need to address the parties' competing arguments on whether § 277 operates to preempt local regulation of quarry reclamation projects, or of

While the judge was concerned that in the aggregate, substantial amounts of impermissible materials will be deposited, we reiterate that the interim policy guards against a collection that would create a "significant risk of harm to health, safety, public welfare[,] or the environment." Moreover, where the interim policy is specific to filling former quarries, the department had to be aware that aggregate quantities of deposited soils would be high, and the department's review of the project accordingly will take total amounts into consideration.

The board and the plaintiffs in the companion case (residents), see note 7, supra, suggest that because MCGI will be compensated for taking the soil deposits, the deposits must constitute unwanted trash. "But one man's rubbish may be another's treasure." 1 J.F. Campbell, Popular Tales of the West Highlands, iii (Alexander Gardner new ed. 1890). There are many examples in contemporary commerce of objects or materials that are unnecessary in a particular location and require payment to transport them to another, and yet are put to beneficial use at another location. In the circumstances of the present case, it is enough to observe that soil materials may need to be removed from a site and developers may be willing to deposit them

projects in general involving soils used to fill land proposed for development.

elsewhere for any number of reasons; it does not mean that the soils are in essence contaminated, unwanted refuse. Indeed, in the circumstances here, the department's policies should ensure that only de minimis quantities of contaminants in soils used as fill may be deposited on the site.

2. The reclamation project as a "use." The board and the residents argue that even if the proposed project does not constitute a commercial dumping ground, the project still is not allowed because, regardless of the type of fill, the reclamation project itself constitutes a "use" and that use is not an allowed use under the bylaw. MCGI contends that the reclamation project is not a "use," that there is no presently proposed use of the property because the quarry is not active or licensed, and that there is no definitive future use; in MCGI's view, the project is "a process that must necessarily precede a future 'use' and does not itself constitute a 'use' of land within the [b]ylaw." MCGI suggests that the proposed project is merely "site work" in anticipation of a future use and does not constitute a use itself.

Having concluded that the project does constitute a "commercial dumping ground," the judge declined to address these arguments. We observe that in analogous circumstances involving the question of what constitutes an incidental use, the Supreme Judicial Court stated that "[d]etermining whether an activity is

an 'incidental' use is a fact-dependent inquiry, which both compares the net effect of the incidental use to that of the primary use and evaluates the reasonableness of the relationship between the incidental and the permissible primary uses."  Henry v. Board of Appeals of Dunstable, 418 Mass. 841, 844 (1994). We, therefore, remand the case for consideration of these issues by the judge in the first instance.  See Merrimack College v. KPMG LLP, 480 Mass. 614, 629 (2018).

We note that our appellate cases have considered whether large earth removal projects constitute an "accessory use" related to the existing or planned future use of the property. See Henry, 418 Mass. at 845 ("We conclude that the net effect of the volume of earth to be removed, the duration of the project, and the scope of the removal project are inconsistent with the character of the existing and intended agricultural uses"); Old Colony Council-Boy Scouts of Am. v. Zoning Bd. of Appeals of Plymouth, 31 Mass. App. Ct. 46, 47-49 (1991) (two and one-half year earth removal project to create cranberry bog not incidental to construction and maintenance of cranberry bog). While they consider earth removal projects, as contrasted with a filling project as in the present case, those cases are instructive.

Here, the 1985 special permit, see note 3, supra, called for storing removed topsoil on the site and the bylaw then in

effect provided that "as soon as possible thereafter [following excavation], ground levels and grades shall be established in accordance with the specifications set forth in the special permit." It is unclear on the present record whether the quarry operators complied with the bylaw or the special permit, and in any event, that special permit expired by its terms after three years and was not renewed.[13] It may well be that for this or other reasons, some level of reclamation may be considered necessary "site work" without constituting a separate and independent "use." We note, however, that the record suggests that the average elevation of the site before quarrying began was approximately 200 feet above sea level, and that MCGI proposes to create a flat plateau of fourteen to seventeen acres at an elevation of 299.5 feet. Although MCGI has stated that the purpose of the project is "to improve current topographic conditions by restoring elevations to pre-quarrying conditions, install a sustainable vegetative cover[,] and prepare the property for future development," in fact, the filling it proposes to conduct will bring the site to a much higher elevation than the prequarrying elevation, and it has not attempted to justify the proposed elevation as necessary for any general or specific use.

---

[13] A subsequent special permit, issued in 1991, was revoked in 1992.

Conclusion.  The judgment of the Land Court entered August 1, 2022, is vacated.  The case is remanded for further proceedings on the use issue consistent with this opinion and for the entry of a declaration that MCGI's proposed project, if conducted so that only de minimis quantities of harmful materials are deposited, would not constitute a commercial dumping ground as that term is used in the bylaw.[14]

So ordered.

---

[14] The board's request for costs is denied.